# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE **MAY 0 8 2014**

*Madsen, C.J.*

CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on May 8, 2014

*Susan L. Carlson* Deputy
for Ronald R. Carpenter
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of | ) | No. 86234-6 |
| | ) | |
| CLINTON MORGAN, | ) | En Banc |
| | ) | |
| Petitioner. | ) | Filed **MAY 0 8 2014** |
| | ) | |

GONZÁLEZ, J.—In 2008, Clinton Morgan was awaiting his civil commitment trial to determine if he was likely to engage in predatory acts of sexual violence if not confined to a secure facility. Defense counsel became concerned that Morgan, who had been diagnosed with schizophrenia, was exhibiting psychotic symptoms. Morgan's counsel requested a competency determination and sought an order for involuntary medication to control Morgan's delusions during trial. The trial judge determined that Morgan was incompetent, appointed a guardian ad litem to represent his interests, and ordered involuntary medication. His trial followed, and the jury unanimously found him to be a sexually violent predator. He is now confined in the Special Commitment Center.

Morgan asks us to reverse his commitment order, arguing that he has a due process right to be competent during a sexually violent predator trial and arguing that a pretrial in-chambers conference violated his right to a public trial. We affirm his commitment.

FACTS AND PROCEDURAL HISTORY

Morgan carries a diagnosis of chronic undifferentiated schizophrenia. He has trouble distinguishing fantasy from reality and has invented an alter ego, a magical persona named Moregaine.

The evidence suggests that Morgan was physically abused as a young child and began committing sexual offenses in his early adolescence. At the age of 13, he pleaded guilty in a juvenile adjudication to indecent liberties with a 15-year-old girl. He was sentenced to 65 weeks in a Juvenile Rehabilitation Administration (JRA) program, where he participated in sexual deviancy treatment. At the juvenile facility he was found to have limited cognitive skills, he exhibited problems distinguishing between fantasy and reality, and he disclosed stimulating and "pervasive, severely sadistic homicidal fantasies." 2 Verbatim Report of Proceedings (VRP) (Aug. 7, 2008) at 175. In the opinion of his juvenile rehabilitation counselor, when Morgan left he did not have a "very good grasp on or understanding of his sexual behavior and what would motivate him in that regard." 1 VRP (Aug. 4-6, 2008) at 41.

After Morgan was released from the JRA in 1994, he continued to receive community-based sex offender treatment until 1997. During this time he was dismissed from the high school basketball team and briefly suspended from school for uninvited physical contact with peer-aged females. Two weeks after completing treatment, Morgan molested a five-year-old girl and a six-year-old girl at a hotel swimming pool. On the day of the assault, he told police officers he wanted "to see if he could handle being close to kids," but once he touched the girls, things "got out of hand" and he "had no control over the situation, period." 2 VRP (Aug. 7, 2008) at 186, 255. He later "said that his victim, quote, wanted me to rape her, end quote." 1 VRP (Aug. 4-6, 2008) at 60. Morgan pleaded guilty to one count of first degree child molestation and received an 89-month sentence.

During his incarceration he exhibited psychotic symptoms and was transferred to the Special Offender Unit at Monroe Correctional Complex in 1999, where he was diagnosed with several conditions, including schizophrenia. He often did not take his medication, which led to involuntary medication throughout 2000 and 2001. While at Monroe, Morgan participated in a sex offender treatment program (SOTP), but his ability to progress appeared to be limited by his psychiatric disorders and developmental limitations. Morgan's fantasies of using force or coercion increased as he

progressed through treatment. He completed the program and upon completion was evaluated at a very high risk to reoffend.

On August 31, 2004, the day before he was scheduled to be released, the Department petitioned to have Morgan committed as a sexually violent predator (SVP). At status conferences in late 2005 and early 2006, Morgan's counsel disclosed that Morgan was experiencing psychotic symptoms, and a competency hearing was held in February 2006. The trial judge found Morgan incompetent and Morgan's attorney, the State, and the trial judge agreed that the SVP trial should proceed. But to "make sure [Morgan's] interests [were] protected," the trial judge appointed a guardian ad litem (GAL) "with experience in this area." VRP (Pretrial Hr'gs) (July 25, 2005; Feb. 23, Apr. 21, Aug. 30, 2006) at 7-8, 19.

In June 2006, Morgan's counsel moved for an order to involuntarily medicate Morgan to control his delusions during trial. The trial judge initially granted the motion orally but later accepted the State's request to consider additional evidence and weigh different interests before making a final ruling. During an in-chambers conference at the end of August 2006, counsel, the GAL, and the trial judge discussed the procedure they would use for hearing further evidence on that motion. The trial judge, a court reporter, and the GAL were physically present in chambers, and counsel participated by phone. Morgan was not present. Defense counsel and the GAL expressed concern that

4

failing to medicate Morgan might deprive him of a fair trial because the jury might think, "Well, he's so crazy, he should be locked up." VRP (Pretrial Hr'gs) (July 25, 2005; Feb. 23, Apr. 21, Aug. 30, 2006) at 30. The GAL noted that "Morgan himself is violently [and] vehemently against any kind of involuntary medication." *Id.* at 31. The trial judge asked the GAL to meet with Morgan's psychiatrist and requested a written report from the psychiatrist with the medical background necessary to decide the involuntary medication issue.

Written reports were subsequently filed in the record. Dr. Sziebert filed a report that detailed Morgan's medication history and discussed the efficacy of involuntary medication in his case. She indicated Morgan did not meet the Special Commitment Center's requirements for being involuntarily medicated because he did not have a grave disability or present a danger to himself or others. She opined that involuntary medication "may benefit Mr. Morgan at his civil commitment trial from the standpoint of helping him curb his impulses and inappropriate behavior." Clerk's Papers at 72. The GAL also submitted a written report noting Morgan's history of positive results from involuntary administration of antipsychotic medications, acknowledging Morgan's opposition to medication, and concluding that it was in Morgan's best interests to be involuntarily medicated. The trial judge ordered involuntary medication.

A jury trial was held in 2008. The State's expert, Dr. Judd, testified that Morgan had two mental abnormalities—paraphilia and pedophilia—and a

5

personality disorder—antisocial personality disorder—that caused him serious difficulties in controlling his sexual behavior. Dr. Judd also gave Morgan a provisional diagnosis of sexual sadism. He testified to the varying and inconsistent accounts that Morgan gave throughout the 1990s and up until the time of the SVP trial of the indecent liberties incident, all of which depart from the official report, oftentimes indicating that the contact was consensual but at other times emphasizing the use of force. An SOTP treatment provider opined that Morgan had not internalized his relapse prevention plan and that she did not expect the skills and interventions he learned in the program to be retained if he did not continue to work on them. Morgan's expert, Dr. Wollert, disagreed with several of Dr. Judd's diagnoses and testified that Morgan's brain had likely matured since his offenses, lowering his recidivism risk. A unanimous jury found Morgan to be a sexually violent predator.

Morgan appealed on various grounds, and the Court of Appeals affirmed. *See In re Det. of Morgan*, 161 Wn. App. 66, 86, 253 P.3d 394 (2011). We granted Morgan's petition for review, limited to "(1) whether involuntary commitment . . . when he was allegedly incompetent violate[d] his due process rights[] and (2) whether the in-chambers conference regarding involuntary medications violated [his] right to a public trial." Order, No. 86234-6 (Wash. Nov. 1, 2011).

STANDARD OF REVIEW

Constitutional questions are questions of law and are subject to de novo review. *State v. McCuistion*, 174 Wn.2d 369, 387, 275 P.3d 1092 (2012) (citing *Amunrud v. Board of Appeals*, 158 Wn.2d 208, 215, 143 P.3d 571 (2006)).

ANALYSIS

In 1990, the legislature created an involuntary civil commitment system for individuals deemed sexually violent predators, commonly known as SVPs. *See generally* ch. 71.09 RCW. A "sexually violent predator" is a person "who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." Former RCW 71.09.020(16) (2006). When we upheld the SVP civil commitment scheme against a substantive due process challenge, we noted the legislature's "honest recognition of the difficulties inherent in treating those afflicted with the mental abnormalities causing the sex predator condition." *In re Pers. Restraint of Young*, 122 Wn.2d 1, 31, 857 P.2d 989 (1993); *see also* RCW 71.09.010. The legislature found that "the exceptional risks posed by sexual predators, and the seemingly intractable nature of their illness, necessitates a specially tailored civil commitment approach." *In re Young*, 122 Wn.2d at 10. SVP proceedings focus not on "the criminal

culpability of . . . past actions," but on "treating [SVPs] for a current mental abnormality, and protecting society from the sexually violent acts associated with that abnormality." *In re Young*, 122 Wn.2d at 21; *see McCuistion*, 174 Wn.2d at 390.

When an offender's sentence for a sexually violent offense has expired or is about to expire, these statutes authorize the State to file a petition alleging the offender to be an SVP. RCW 71.09.025, .030. If the court or jury determines beyond a reasonable doubt that the individual is an SVP, he or she is committed for an indefinite period of time, until either "(a) [t]he person's condition has so changed that the person no longer meets the definition of a sexually violent predator; or (b) conditional release to a less restrictive alternative . . . is in the best interest of the person and conditions can be imposed that would adequately protect the community." RCW 71.09.060(1). SVPs are housed in a secure facility, and the Department of Social and Health Services (DSHS) is charged with the responsibility of providing care and treatment. RCW 71.09.060(1). The State must justify continued commitment through an annual review. RCW 71.09.070(1).

*Due Process*

It is well settled that civil commitment is a significant deprivation of liberty, and thus individuals facing SVP commitment are entitled to due process of law. *In re Det. of Stout*, 159 Wn.2d 357, 369, 150 P.3d 86 (2007) (citing

8

*Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d (1979); *In re Det. of Halgren*, 156 Wn.2d 795, 807-08, 132 P.3d 714 (2006)). Procedural due process requires notice and an opportunity to be heard "'at a meaningful time and in a meaningful manner.'" *Amunrud*, 158 Wn.2d at 216 (internal quotation marks omitted) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). The process due depends on what is fair in a particular context. *E.g., In re Stout*, 159 Wn.2d at 370 (citing *Mathews*, 424 U.S. at 334).

To determine whether a particular procedural protection is required in a given context, we consider (1) the liberty interest at stake; (2) the risk of erroneous deprivation of that liberty interest with the existing procedures and the probable value, if any, of additional safeguards; and (3) the government interest, including costs and administrative burdens of additional procedures. *Id.*

The first *Mathews* factor weighs in Morgan's favor. Morgan has a significant interest in his physical liberty.

The second *Mathews* factor weighs heavily in favor of the State. Robust statutory guaranties in chapter 71.09 RCW provide substantial protection against an erroneous deprivation of liberty. *In re Stout*, 159 Wn.2d at 370-71; *McCuistion*, 174 Wn.2d at 378-79. Before commitment proceedings may even be initiated, the State must show probable cause. *In re Young*, 122 Wn.2d at 48

(citing RCW 71.09.040(1)). At the probable cause hearing, the respondent facing potential SVP proceedings has the right to counsel at public expense, to present evidence on his or her own behalf, to cross-examine adverse witnesses, and to view and copy all petitions and reports in the court file. RCW 71.09.040(3). For the SVP determination, the respondent has the right to a jury of 12 peers. RCW 71.09.050(3). At trial, the State carries the burden of proof beyond a reasonable doubt, and in a jury trial, the verdict must be unanimous. RCW 71.09.060(1). Throughout, the respondent has the right to counsel, including appointed counsel, to meaningfully access this panoply of rights and procedural protections. RCW 71.09.050(1). Here, the trial court's appointment of a GAL for Morgan provided an additional safeguard.

Moreover, once an individual has been committed, "the State [is required to] justify continued incarceration through an annual review." *McCuistion,* 174 Wn.2d at 388 (citing RCW 71.09.070). If DSHS finds that the individual's condition has changed such that he or she no longer meets the definition of an SVP or conditional release to a less restrictive alternative would be appropriate, the individual is entitled to an evidentiary hearing, at which he or she again enjoys a panoply of procedural protections. RCW 71.09.090(1), (3). Even if DSHS finds that the individual continues to meet the criteria for confinement, the individual is entitled to a show cause hearing, at which he or she has the

right to counsel and to present responsive affidavits or declarations. *McCuistion*, 174 Wn.2d at 393 (citing RCW 71.09.090(2)).

In sum, Morgan had an opportunity to meaningfully contest facts in a criminal trial; he had a full SVP trial with many protections guaranteed to criminal defendants; and he was represented by counsel throughout the proceedings. Although his participation was potentially diminished due to incompetency, a GAL was charged with representing his best interests, and we find the existing protections nevertheless robust.

The third *Mathews* factor also weighs in favor of the State. "[I]t is irrefutable that the State has a compelling interest both in treating sex predators and protecting society from their actions." *In re Young*, 122 Wn.2d at 26 (citing *Addington v. Texas*, 441 U.S. 418, 426, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979)); *In re Det. of Thorell,* 149 Wn.2d 724, 750, 72 P.3d 708 (2003). In cases involving incompetent respondents, Morgan argues that using civil commitment proceedings under chapter 71.05 RCW instead of SVP proceedings under chapter 71.09 RCW will reduce the risk of an erroneous deprivation of liberty and satisfy these State interests. We disagree.

The legislature has clearly found that the chapter 71.05 RCW scheme is not suitable for the special challenges of SVPs. *See* RCW 71.09.010; *In re Thorell*, 149 Wn.2d at 749 (noting that "SVPs have treatment issues distinct from those amenable to treatment under chapter 71.05"). Indeed, the

11

legislature found that "the treatment modalities for [the SVP] population are very different than the traditional treatment modalities for people appropriate for commitment under the involuntary treatment act." RCW 71.09.010. Under chapter 71.05 RCW, commitment orders are limited to 180 days, and the State must file a new petition and bear the burden of proof in order to extend the order. RCW 71.05.320. But the legislature has found that persons committed as SVPs "generally require prolonged treatment in a secure facility followed by intensive community supervision in the cases where positive treatment gains are sufficient for community safety." LAWS OF 2005, ch. 344, § 1. A finding that competency must be restored prior to SVP civil commitment could result in the indefinite and perhaps permanent housing of alleged SVPs under chapter 71.05 RCW in places that are "insufficiently secure," RCW 71.09.060(3), or the release of incompetent suspected SVPs who do not satisfy the requirements of chapter 71.05 RCW. Prohibiting the State from pursuing commitment of an incompetent suspected SVP under chapter 71.09 RCW would significantly undermine the safety of the public and of those persons committed to state mental hospitals.

We find no additional protections that would minimize the risk of error without significantly undermining compelling State interests. Balancing the *Mathews* factors, we are satisfied that adequate procedural due process was provided Morgan. Courts in other states with similar statutes have uniformly

held as much. *See Moore v. Superior Court*, 50 Cal. 4th 802, 237 P.3d 530, 114 Cal. Rptr. 3d 199 (2010); *Commonwealth v. Nieves,* 446 Mass. 583, 846 N.E.2d 379, 385-86 (2006); *see also State ex rel. Nixon v. Kinder*, 235 Mo. App. 168, 129 S.W.3d 5, 10 (2003) (finding that an SVP "determination, regardless of competency, is not an unconstitutional deprivation of liberty"); *In re Det. of Cubbage,* 671 N.W.2d 442 (Iowa 2003) (finding that a lack of pretrial evaluation of competency causes no deprivation of due process rights); *In re Commitment of Weekly*, 647, 2011 IL App (1st) 102276, 956 N.E.2d 634, 353 Ill. Dec. 772 (establishing that fitness evaluation does not impact ability to receive a fair commitment trial).

Morgan also contends that subjecting an incompetent detainee to an SVP trial violates substantive due process. Substantive due process prohibits certain governmental action even when the procedures are constitutionally adequate. *Amunrud*, 158 Wn.2d at 218-19. Substantive due process forbids the government from interfering with a fundamental right unless the infringement is narrowly tailored to serve a compelling state interest. *Id.* The United States Supreme Court has recognized certain fundamental rights protected by the due process clause but not explicitly enumerated in the Bill of Rights. *See id.* at 220. Although a fundamental right to competency may be recognized in the criminal context, prior cases have established that the same concerns and concomitant protections that arise in a criminal case do not necessarily arise in

13

the civil commitment arena. *See Kansas v. Hendricks*, 521 U.S. 346, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997). And the United States Supreme Court has "'always been reluctant to expand the concept of substantive due process.'" *Sacramento v. Lewis*, 523 U.S. 833, 842, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992)). We follow other courts in declining to recognize a fundamental right to competency in the civil commitment context. *See Nixon*, 129 S.W.3d 5; *In re Cubbage*, 671 N.W.2d 442.

When government action does not affect a fundamental right, the proper standard of review is rational basis. *Amunrud*, 158 Wn.2d at 220. Under rational basis review, the challenged law must be rationally related to a legitimate state interest. *Seeley v. State*, 132 Wn.2d 776, 940 P.2d 604 (1997). For the reasons discussed, existing processes for committing an incompetent individual as an SVP are rationally related to the State's legitimate interest in treating sex predators and protecting society from their actions.

*Public Trial Right*

Finally, Morgan contends that a pretrial in-chambers discussion violated his right to a public trial. Suppl. Br. of Pet'r at 18-21. Article I, section 10 of the Washington Constitution provides that "[j]ustice in all cases shall be administered openly," protecting Morgan's "individual right to have the proceedings open to the observation and scrutiny of the general public." *In re*

14

*Det. of D.F.F.*, 172 Wn.2d 37, 40, 256 P.3d 357 (2011). There is a strong presumption that courts are to be open at all stages of a trial, "[b]ut not every interaction between the court, counsel, and defendants will implicate the right to a public trial[ ] or constitute a closure if closed to the public." *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012).

The open administration of justice serves "to ensure a fair trial, to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, to encourage witnesses to come forward, and to discourage perjury." *Id.* at 72 (citations omitted). It also affirms the legitimacy of the proceedings and promotes confidence in the judiciary. *State v. Momah*, 167 Wn.2d 140, 148, 217 P.3d. 321 (2009). To determine whether a specific proceeding implicates these core values, we apply the experience and logic test. *Sublett*, 176 Wn.2d at 73.[1] If both prongs of the test are met, the constitution mandates the specific proceeding be open. *Id.* Under the experience prong, we consider "'whether the place and process have historically been open to the

---

[1] *Sublett* concerned a criminal defendant's rights under article I, section 22, but we also use the experience and logic test to analyze whether an event triggers the protections of article I, section 10. As we observed in *Sublett*, we have "historically analyzed allegations of a court closure under either article I, section 10 or article I, section 22 analogously, although each is subject to different relief depending upon who asserts the violation." *Sublett*, 176 Wn.2d at 71 n.6. Moreover, we adopted the experience and logic test from *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986), a case under the First Amendment to the United States Constitution, and noted that the public's right to open proceedings under article I, section 10 of our state constitution mirrors the First Amendment. *Id.*

15

press and general public,'" and under the logic prong we ask "'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Id.* (quoting *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)).

In substance, the proceeding at issue was akin to a status conference, which in common experience may take place in chambers rather than in open court. The in-chambers conference concerned the procedure for hearing additional evidence regarding the need for involuntary medication. Counsel, the GAL, and the trial judge discussed the legal standard for involuntary medication and agreed that the GAL would request a report from the DSHS psychiatrist about whether medication would help control Morgan's delusions during trial. Unlike a trial or some motion hearings, no evidence or testimony was presented, no substantive decisions were made, and no orders were entered. *See id.* at 77. Subsequently, reports from the DSHS psychiatrist and the GAL were filed in the record and the trial judge entered an order for involuntary medication.

Turning to the logic prong, public access to the in-chambers conference would have made little difference to the functioning of the conference or the involuntary medication proceedings overall. The evidence that was eventually admitted and the decision that followed were filed in the open record. Thus, there was meaningful public access to the court proceedings that concerned

involuntary medication. Under the experience and logic test, Morgan's rights "as a member of the public to attend the proceedings" and as "the target of a civil action . . . to have the proceedings open to the observation and scrutiny of the general public" were not violated. *In re Det. of D.F.F.*, 172 Wn.2d at 40.[2]

CONCLUSION

We find the challenged in-chambers conference did not implicate public trial rights under article I, section 10, and due process did not require Morgan to be competent for his SVP trial. We affirm Morgan's civil commitment.

---

[2] Morgan's supplemental brief also argues that Morgan had a due process right to be present. Suppl. Br. of Pet'r at 22. But we decline to address that issue because only the article I, section 10 public trial right issue is properly before us. Order, No. 86234-6 (Wash. Apr. 30, 2013).

_Gonzáler, J._

WE CONCUR:

_Madsen, C.J._

_P.T._

_Wiggins, J._

No. 86234-6

STEPHENS, J. (dissenting)—An individual facing detention as a sexually violent predator (SVP) should have a procedural due process right to be competent at trial. This is essential to the integrity of the SVP statutory scheme and our constitutional obligations. As the majority recognizes, "It is well settled that civil commitment is a significant deprivation of liberty." Majority at 8 (citing *In re Det. of Stout*, 159 Wn.2d 357, 369, 150 P.3d 86 (2007). For this reason, the quasi-criminal statutory scheme under which persons are civilly committed as SVPs for treatment in the Special Commitment Center (SCC) must comport with due process. *Stout*, 159 Wn.2d at 369 (explaining that "individuals facing commitment, especially those facing SVP commitment, are entitled to due process of law before they can be committed."). At a minimum this means an alleged SVP has a right to counsel and to a trial by jury at which the Department of Social and Health Services (Department) carries the burden of proof beyond a reasonable doubt that the individual in question is an SVP. *See id.* at 371-72. It should also mean that an incompetent person cannot be forced through a trial.

This case primarily concerns procedural due process.[1] At its core, procedural due process requires notice and a meaningful opportunity to be heard. *In re Pers. Restraint of Bush*, 164 Wn.2d 697, 704, 193 P.3d 103 (2008). It is a flexible concept and "'calls for such procedural protections as the particular situation demands.'" *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972)). As the majority observes, majority at 9, we employ the balancing test set forth in *Mathews* to determine whether a particular procedural protection is warranted in a given context. *Stout*, 159 Wn.2d at 370. That test requires us to consider (1) the liberty interest at stake; (2) the risk of erroneous deprivation of that liberty interest with the existing procedures and probable value, if any, of additional safe guards; and (3) the government interest, including costs and administrative burdens of additional procedures. *Id.* at 370.

There is no debate that the first factor weighs heavily in Morgan's favor. A "civil commitment deprives [Morgan] of significant liberty interests." *In re Det. of Morgan*, 161 Wn. App. 66, 79, 253 P.3d 394 (2011). This is especially true because the likelihood of release from the SCC is limited. *See* RCW 71.09.090(4)(b) (explaining that unless an annual review reveals a detainee no longer meets the criteria for confinement, a detainee will receive a full hearing on the continued

---

[1] As the majority notes, Morgan also makes a substantive due process argument. My resolution of this case would rest on recognizing a procedural due process right to be competent during an SVP trial, and I would not reach the substantive due process issue.

validity of confinement only if he or she has a severe, permanent physiological change such as a stroke or if he or she successfully completes treatment).

Resolution of the second factor is considerably more complicated. The Court of Appeals reasoned that there were no additional safeguards that would have minimized or prevented an erroneous deprivation of Morgan's rights. *Morgan*, 161 Wn. App. at 80. The Court of Appeals suggested that Morgan received all the process he was due because he attended his SVP commitment trial and "had counsel vehemently defending his rights." *Id.* The majority endorses this view, arguing that chapter 71.09 RCW already "provide[s] substantial protection against an erroneous deprivation of liberty" and that Morgan's court-appointed guardian ad litem adequately represented his interests. Majority at 9, 11.

But the panoply of trial rights the majority identifies mean little if an individual is required to stand trial while incompetent. "Competency" means an individual understands the nature of the proceedings against him and is able to assist in his own defense. *State v. Hahn*, 106 Wn.2d 885, 895, 726 P.2d 25 (1986). Competency is therefore a necessary predicate to the effective exercise of one's right to counsel. The United States Supreme Court has recognized the relationship between competency and the rights of the accused in a criminal context.

> It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial. . . . Some have viewed the common-law prohibition "as a by-product of the ban against trials *in absentia;* the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself."

*Drope v. Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975) (quoting Caleb Foote, *A Comment on Pre-Trial Commitment of Criminal Defendants*, 108 U. PA. L. REV. 832, 834 (1960)). The prohibition on subjecting an incompetent person to criminal proceedings, explained the *Drope* court, "is fundamental to an adversary system of justice." *Id.* at 172.

To be sure, we have confirmed many times that an SVP trial is a civil, not criminal, proceeding. *See, e.g., In re Pers. Restraint of Young*, 122 Wn.2d 1, 23, 857 P.2d 989 (1993). But we have frequently relied on the quasi-criminal procedural protections afforded to an accused SVP to sustain the statutory scheme's overall constitutionality. *See State v. McCuistion*, 174 Wn.2d 369, 393, 275 P.3d 1092 (2012) (explaining that amendments to the SVP statutory scheme posed a low risk of erroneous deprivation of liberty "[g]iven the extensive procedural safeguards in chapter 71.09 RCW"); *Stout*, 159 Wn.2d at 370-71 (rejecting procedural due process claim to a confrontation right in light of the "comprehensive set of rights for the SVP detainee"); *see also Kansas v. Hendricks*, 521 U.S. 346, 364, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) (noting that Kansas SVP statutory scheme afforded "numerous procedural and evidentiary protections," which "demonstrate[d] that the Kansas Legislature has taken great care to confine only a narrow class of particularly dangerous individuals, and then only after meeting the strictest procedural standards"). Surely, the right to counsel is diluted by incompetency in an SVP proceeding to the same degree it is in a criminal proceeding. When the right to

counsel—essential the very right to mount a defense—is diluted, the procedure for detaining individuals as SVPs loses its constitutional footing.

The majority engages in little analysis about the value of additional safeguards, the other piece of the second *Mathews* factor. Requiring that an individual be competent before being tried under chapter 71.09 RCW brings significant value to the process. It ensures that individuals are not subjected to involuntary detention based on the results of what is essentially a trial in abstentia. It ensures that juries are presented with an individual who can understand the nature of the proceedings against him. Perhaps most important, and as will be discussed further below, it ensures that persons detained under chapter 71.09 RCW are amenable to the specific treatment modalities that serve the goals of the SVP scheme, rather than having their treatment undermined by coexisting psychiatric disorders better treated elsewhere.

In light of these concerns, I would conclude that the risk of erroneous deprivation of liberty is high when an incompetent person is made to stand trial. Consequently, the value of requiring a competent person in the proceedings is significant.

The majority believes the third *Mathews* factor, the government's interest, weighs in favor of the Department. Certainly the Department has a compelling interest in "treating sex predators and protecting society from their actions." *Young*, 122 Wn.2d at 26. But as noted above, it is difficult to see how this interest is actually served when an incompetent person suffering severe psychiatric disturbances is

committed to the SCC. The Department has offered no assurance that the treatment modalities at the SCC can effectively address the kind of mental illness generally treated via civil commitment under chapter 71.05 RCW. The scholarly research available suggests that an incompetent person will not be able to participate in SVP treatment. "[A]ttempting to curb the compulsively lurid behaviors of an SVP that precipitate within the matrix of a florid psychosis or severe cognitive impairments would likely prove futile. . . . [C]urrently available treatments for SVPs finds its provenance in rational, goal-directed, even insightful, cognition." Alan A. Abrams et al., *The Case for a Threshold for Competency in Sexually Violent Predator Civil Commitment Proceedings*, 28 AM. J. FORENSIC PSYCHIATRY no.3, 2007, at 7, 22-23.

The Department has offered nothing to refute such a conclusion. Indeed, during Morgan's trial, a sex offender treatment provider testified that it is important for an individual receiving sex offender treatment to "know what reality [is]. I mean we're really dealing with reality in treatment. You've done something that got you in trouble, how are you not going to do that again? Yeah, I needed [Morgan] to think clearly." 1 Verbatim Report of Proceedings (Aug. 4-6, 2008) at 72. Given that the Department's interest in effective treatment of SVPs is seemingly undermined when it seeks to have an incompetent person adjudicated an SVP, the third factor should tip in Morgan's favor.[2]

---

[2] This court's reasoning in *Stout* would not foreclose recognizing a due process right to competency here. In *Stout*, this court considered an asserted due process right to confrontation and concluded that the right to confrontation was not necessary in light of the process already afforded to an accused SVP. *Stout*, 159 Wn.2d at 371, 374. But as noted, those very rights—especially the critical right to counsel—have little meaning if the

The majority echoes the Court of Appeals' concern that requiring competency to be restored prior to an SVP civil commitment proceeding could result in the indefinite housing of alleged SVPs in state mental hospitals. Majority at 12; *see also Morgan*, 161 Wn. App. at 81-82 (quoting *Moore v. Superior Court*, 50 Cal. 4th 802, 825-26, 237 P.3d 530 (2010)). But if the Department's interest is in treating SVPs and treatment requires competency, then it is difficult to see why detention in the SCC is desirable in this instance. Moreover, the Department can bring a petition under chapter 71.05 RCW to civilly commit an alleged SVP and seek to have the person restored to competency. The majority worries this will mean accused SVPs will be housed "in places that are 'insufficiently secure.'" Majority at 12 (quoting RCW 71.09.060(3)). But the Department acknowledges it already houses such persons in our state mental hospitals. *See In re Det. of McGary*, 128 Wn. App. 467, 470-71, 116 P.3d 415 (2005) (concerning a case in which the Department dismissed an SVP petition without prejudice so that the individual could be involuntarily committed under chapter 71.05 RCW and treated for schizophrenia).

Contrary to the Department's argument, it is not dispositive that RCW 71.09.060(3) prohibits the Department from placing an accused SVP in a state

---

accused SVP is incompetent. It is also worth pointing out that Stout did not make a *Mathews* argument, which the court noted "tip[ped] the third factor of the *Mathews* test in favor of the State," as the court had no counter-argument to the State's contention that providing a confrontation right would be prohibitively expensive. *Id.* at 372 n.11. Here, each party has presented a well-briefed and researched argument based on the *Mathews* test.

facility other than the SCC during SVP proceedings. Resp't's Suppl. Br. at 11. That statute reads:

> Except as otherwise provided in this chapter, the state shall comply with RCW 10.77.220 while confining the person. During all court proceedings where the person is present, the person shall be detained in a secure facility. If the proceedings last more than one day, the person may be held in the county jail for the duration of the proceedings, except the person may be returned to the department's custody on weekends and court holidays if the court deems such a transfer feasible. The county shall be entitled to reimbursement for the cost of housing and transporting the person pursuant to rules adopted by the secretary. The department shall not place the person, even temporarily, in a facility on the grounds of any state mental facility or regional habilitation center because these institutions are insufficiently secure for this population.

RCW 71.09.060(3). This statute should not be read to disallow placement of a suspected SVP in a state mental hospital when the purpose is to have his or her competency restored and the SVP proceedings have been suspended or dismissed until competency is restored. Indeed, that appears to be exactly what the Department did in *McGary*.[3] The only restriction in RCW 71.09.060(3) is that an individual who is currently standing trial as or has been adjudicated an SVP cannot be housed in a state mental hospital.

Likewise, the majority's suggestion that the legislature has found commitments under chapter 71.05 RCW unsuitable for the special challenges of SVPs is misplaced. Majority at 11 (citing RCW 71.09.010). Morgan would not be adjudicated as an SVP were he awaiting competency restoration. Nothing suggests

---

[3]*McGary* also tends to disprove the suggestion that accused SVPs who are incompetent will never be committed as SVPs. There, the accused SVP had his competency restored at Western State Hospital and was later committed to the SCC.

that the Department does not already commit persons to state mental hospitals who have perpetrated serious sexual offenses. Moreover, even if RCW 71.09.010 does mean that *suspected* SVPs cannot be committed to state mental hospitals to restore competency, this statute does not control Morgan's due process right to have his competency restored before he stands trial as a suspected SVP. The Department has not shown that the government's interest outweighs Morgan's due process interest in not being tried while incompetent. Indeed, if the concern is finding a suitable placement option for accused SVPs who are incompetent to stand trial, the State's options are not limited by any lack of statutory authority.

I am aware that other states have declined to recognize a right to competency during SVP proceedings. *See, e.g., In re Commitment of Weekly*, 201 IL App. (1st) 102276, 956 N.E.2d 634, 353 Ill. Dec. 772 (2011); *Moore*, 237 P.3d 530; *In re Commitment of Luttrell*, 312 Wis.2d 695, 754 N.W.2d 249 (2008); *Commonwealth v. Nieves*, 446 Mass. 583, 846 N.E.2d 379 (2006); *State ex rel. Nixon v. Kinder*, 235 Mo. App. 168, 129 S.W.3d 5 (2003); *In re Det. of Cubbage*, 671 N.W.2d 442 (Iowa 2003). This case presents a question of first impression for this court, and no court faced with this exact question has found a due process violation. But several of the courts that have rejected a due process right have relied on a flawed balancing of the *Mathews* factors. Much like the majority does, they have ignored concerns about effective SVP treatment and the indisputable relationship between competency and the meaningful exercise of the right to counsel and other essential procedural safeguards. *See, e.g., Moore*, 237 P.3d at 543-47.

A complete *Mathews* analysis supports the conclusion that procedural due process requires an accused SVP be competent to stand trial. Although the weight of authority from other jurisdictions has come to the opposite conclusion, no court has presented an analysis that justifies its result. I would not parrot the reasoning of those courts as a substitute for a hard look at what the constitution expects of a justice system. Instead, I would hold that the trial rights afforded to an accused SVP—rights that are given in recognition of the caution with which the government must proceed when contemplating a liberty deprivation of this nature—have little force if an accused SVP is not competent. I would reverse the Court of Appeals and hold that an individual has a procedural due process right to be competent when tried as an SVP. I therefore respectfully dissent.[4]

---

[4] I agree with the majority's analysis as to the public trial issue presented here.

Stephens, J.

Gordon McCloud, J.

No. 86234-6

GORDON McCLOUD, J. (concurring in dissent)—I agree with, and have signed, the dissent in this case. I write separately to address the majority's public trial analysis. The majority concludes that the August 2006 pretrial meeting in chambers between the trial judge, the guardian ad litem, and counsel (but not Mr. Morgan) was a "status conference" to which the public trial right did not attach. Majority at 16. I disagree.

The context shows that it was far more than a simple status conference. It was identified as a motion hearing at the time of the hearing. Verbatim Report of Proceedings (Pretrial Hr'gs) (Aug. 30, 2006) at 28 ("[T]his is the State's motion for further proceedings related to involuntarily medicating Mr. Morgan."). Further, it was identified as the hearing at which the State wanted to bolster its factual record and legal argument about why forcible medication was permissible, a very nontrivial subject. *Id.* at 29. And in the judge's order to involuntarily medicate Mr. Morgan,

entered in December 2006, he seems to have referred back to the August hearing in saying that he had considered "oral argument from counsel." Suppl. Clerk's Papers at 81.

The hearing at issue in this case was thus more like a competency hearing or involuntary commitment hearing than a mere status update. Competency proceedings are presumptively public. *State v. Chen*, 178 Wn.2d 350, 359 & n.12, 309 P.3d 410 (2013) (Gordon McCloud, J., concurring) (citing U.S. CONST. amend. I; WASH. CONST. art. I, § 10). And so are involuntary commitment proceedings. *In re Det. of D.F.F.*, 172 Wn.2d 37, 46-47, 256 P.3d 357 (2011) (citing WASH. CONST. art. I, § 10). I would therefore hold that the hearing in this case was presumptively public.

Gordon McCloud, J.

Fairhurst, J.