IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 108,856

In the Matter of the Care and Treatment of PAUL SYKES.

SYLLABUS BY THE COURT

1.

Mental incompetence is not a defense in a civil action.

2.

Based on the challenge in this case, the Kansas Sexually Violent Predator Act, K.S.A. 59-29a01 *et seq*., complies with constitutional requirements for substantive and procedural due process.

3.

A respondent does not have to be mentally competent to assist in his or her own defense in order to be civilly adjudicated a sexually violent predator under the Kansas Sexually Violent Predator Act.

Review of the judgment of the Court of Appeals in 49 Kan. App. 2d 859, 316 P.3d 811 (2014). Appeal from Wyandotte District Court; KATHLEEN M. LYNCH, judge. Opinion filed February 19, 2016. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Michael G. Highland*, of Bonner Springs, argued the cause and was on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was on the briefs for appellee.

1

The opinion of the court was delivered by

ROSEN, J.: Despite having been found incompetent to assist in his own defense, Paul Sykes was adjudicated a sexually violent predator. On review of the decision by the Court of Appeals, we affirm the adjudication.

In 1987, Sykes was convicted in Wyandotte County of burglary and aggravated sexual battery, based on an incident in which he broke into a house and hit a couple of young female occupants, who observed that his pants were unzipped and his penis was visible. He spent much of his confinement at Larned State Hospital. His sentence expired in 2007. Prior to the expiration of his sentence, the State filed a petition in Wyandotte County seeking to have him adjudicated a sexually violent predator.

The district court found probable cause to believe that Sykes was such a predator and ordered him transferred to Larned State Hospital for evaluation. In 2008, the district court determined that Sykes was not competent to stand trial. The court ordered that he continue to be evaluated and treated at the Larned facility under K.S.A. 22-3303. Following the evaluation, the court found that Sykes was not competent to stand trial and was unlikely to become competent in the foreseeable future and that involuntary civil commitment proceedings should be commenced.

In 2009, the district court of Pawnee County issued an order holding that K.S.A. 22-3301 *et seq.* applied only to criminal defendants subject to sexually violent predator proceedings, not to respondents in proceedings for civil commitments in other proceedings. The court accordingly dismissed the proceedings for want of subject matter jurisdiction.

In 2011, following further competency evaluations, the Wyandotte District Court issued an order holding that Sykes would not be competent to stand trial in a criminal proceeding. Noting that it was a matter of first impression, the court held that incompetence to answer to criminal accusations is legally distinct from incompetence to answer to a civil complaint, and the court set the matter for trial under the Kansas Sexually Violent Predator Act, K.S.A. 59-29a01 *et seq.*

Sykes argued through counsel that a trial in the absence of mental competence violated due process, and he filed a motion seeking leave to take an interlocutory appeal under K.S.A. 60-2102(c). The district court granted the motion, but the Court of Appeals declined to authorize the interlocutory appeal.

Over Sykes' objections, the case proceeded to trial. Against his counsel's advice, Sykes requested a jury trial. After a jury was impaneled, however, his counsel persuaded him to proceed instead with a bench trial. Noting Sykes' shifting positions, the court asked him whether he understood what he was doing, and he replied that he did not. With the encouragement of the court, Sykes' counsel called the office of the Disciplinary Administrator for advice on whether it would be proper for him to represent a client in a bench trial who appeared to be so confused about what his rights were that he could not assist with his defense. The Disciplinary Administrator informed counsel that he would not be in violation of the disciplinary rules so long as his client voiced his approval of proceeding without a jury.

At trial, the State introduced the testimony of the victims of the 1987 sexual battery and of several psychological experts. One of those experts, Dr. Jane Kohrs, a psychologist, interviewed Sykes for a clinical service report in December of 2006 at Larned after reviewing a significant portion of his records. She was only able to interview him for 45 minutes before he became too upset to continue a dialogue. Dr. Kohrs

3

concluded that Sykes qualified for commitment because he would be unable to prevent a relapse. She noted that Sykes had been cited three times for lewd acts while confined and had exposed himself to and groped female staff members. She ultimately diagnosed him with schizophrenia, an antisocial and narcissistic personality disorder, and substance abuse and borderline intellectual functioning.

Dr. John Reid, a psychologist at Larned, interviewed Sykes twice, first in 2007 and again in 2011. In his first interview, Dr. Reid found that Sykes was not forthcoming about his crime, was unable to stay on his medications, was unable to finish his sexual abuse treatment program, and was unable to acknowledge at-risk situations. Dr. Reid ultimately diagnosed Sykes with schizophrenia, paranoid type with exhibitionism, alcohol dependence, antisocial personality, and borderline intellect. Applying several psychometric tests, Dr. Reid concluded that Sykes had a 39% chance of recidivism within 5 years, a 45% chance of recidivism within 10 years, and a 52% chance of recidivism within 15 years. He further explained that this was likely an underestimate because it did not capture all of Sykes' criminal history.

Upon returning to interview Sykes in 2011, Dr. Reid found him more clear, lucid, and cordial, but his final assessment remained that Sykes met the criteria for a sexually violent predator. Dr. Reid recommended that Sykes should go into the Larned parallel program for treatment. Dr. Reid noted that no one has ever successfully completed this seven-step program.

Dr. Robert Barnett, a psychologist who had interviewed Sykes in the past, testified for the defense. He testified that he did not believe that Sykes qualified for antisocial personality disorder. He also testified that, while Sykes probably met the definition of a sexually violent predator, the treatment in Larned would probably be ineffective.

4

Sykes appeared as a witness on his own behalf. His answers to questions from his counsel were generally meandering and nonresponsive. The following exchange was typical:

"Q.     Well, you heard everybody talking in here about whether you are a sexual predator?

"A.     Yeah, that's what I am saying. You know, she is lying about me beating her. I ain't beat a damn thing. I run out of the house. It was just a little bitty white house on 13th Street. I seen 13th Street, down on one end and they still on the other end. I seen them every day."

The district court ultimately ruled that Sykes was a sexually violent predator and ordered him to be committed until such time that it would be safe for him to be at large. He took a timely appeal, and, in a published opinion, the Court of Appeals affirmed the judgment of the district court. *In re Care & Treatment of Sykes*, 49 Kan. App. 2d 859, 316 P.3d 811 (2014). This court granted Sykes' petition for review.

Sykes raises a single issue on appeal. He contends that due process requires that a respondent be competent to understand the nature of a sexually violent predator commitment proceeding and be able to assist his counsel in such a proceeding.

Whether a party's constitutional right to due process has been violated is a question of law subject to de novo review. See *State v. Roeder*, 300 Kan. 901, 927, 336 P.3d 831 (2014); *State v. Turner*, 300 Kan. 662, 675-76, 333 P.3d 155 (2014).

Kansas has enacted two parallel schemes for the involuntary civil commitment of individuals whose mental state is such that they may be dangerous to themselves or to others. K.S.A. 59-2945 *et seq.* establishes procedures for involuntary confinement and

5

treatment of certain people who are mentally ill, who lack the capacity to make informed decisions concerning treatment, and who are likely to cause harm to themselves or others. K.S.A. 2014 Supp. 59-2946(e), (f). The statutory scheme includes protections such as probable cause findings, the right to counsel, the right to a jury trial, a standard of proof beyond a reasonable doubt, and periodic review for determining whether the patient remains mentally ill.

K.S.A. 59-29a01 *et seq.* sets out procedures specifically tailored to address sexually violent predators, that is, people who have been convicted of or charged with sexually violent offenses and who suffer from mental abnormalities or personality disorders that makes them likely to engage in repeated acts of sexual violence. K.S.A 2014 Supp. 59-29a02(a). The statute satisfies the requirements of due process by providing a range of basic protections, including appointed counsel, a probable cause hearing, appointment of qualified experts for examinations, a jury trial requiring a unanimous decision, appeals, annual examinations, discharge petitions, and the strictest possible burden of proof on the State. *In re Care & Treatment of Hay*, 263 Kan. 822, 831, 953 P.2d 666 (1998).

Proceedings under K.S.A. 59-29a01 *et seq.* are civil, not criminal, in nature. *Kansas v. Hendricks*, 521 U.S. 346, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997). As a consequence, the procedures for establishing competence for criminal defendants, K.S.A. 2014 Supp. 22-3302, do not apply. A further consequence of the designation as a civil proceeding is that the abatement requirements of criminal procedure are not invoked. Other protections are provided to incompetent defendants in civil proceedings. See, *e.g.*, *United States v. Mandycz*, 351 F.3d 222, 225 n.1 (6th Cir. 2003) (under federal rules of civil procedure, incompetent defendants entitled to appointment of guardians ad litem, but mental incompetence not recognized as defense in civil action); K.S.A. 2014

6

Supp. 60-217(c) (guardian or other fiduciary may defend on behalf of incompetent party in civil proceeding).

A civil commitment for any purpose nevertheless constitutes a significant deprivation of liberty that requires the protection of due process of law. See *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979); *Jackson v. Indiana*, 406 U.S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972); *Humphrey v. Cady*, 405 U.S. 504, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972); *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967); *Specht v. Patterson*, 386 U.S. 605, 87 S. Ct. 1209, 18 L. Ed. 2d 326 (1967).

In making his argument that the sexual predator proceeding violated his due process rights by subjecting him to confinement without his ability to assist in his own defense, Sykes essentially asks this court to retreat from the established law holding that proceedings under K.S.A. 59-29a01 *et seq.* are civil in nature. There is no statutory requirement of competence in civil proceedings, and we decline to create one. In *Hendricks*, the United States Supreme Court found the statutory scheme for confining sexually violent predators to be constitutional on its face. 521 U.S. at 356-60. In *Hay*, this court determined that the specific protections that the statute provides satisfy the requirements of procedural due process. 263 Kan. at 831-32. The combination of a constitutionally sound confinement procedure with a rule that competence is not required in civil proceedings leads us to conclude that Sykes did not suffer a violation of his due process rights.

The Kansas statute is patterned on a very similar statutory scheme enacted in the state of Washington in 1990. See *In re Care & Treatment of Hendricks*, 259 Kan. 246, 249-50, 912 P.2d 129 (1996). In *In re Detention of Morgan*, 180 Wash. 2d 312, 330 P.3d 774 (2014), the Washington Supreme Court recently considered an issue much like the

7

one presented now to this court. The *Morgan* court affirmed the commitment of a respondent who was determined to be incompetent but who was nevertheless adjudicated by a jury to be a sexually violent predator.

Citing *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), the Washington court applied a three-part test to determine the extent of protection due to a respondent in an involuntary commitment proceeding: (1) the liberty interest at stake; (2) the risk of erroneous deprivation of that liberty interest with the existing procedures and the probable value, if any, of additional safeguards; and (3) the government interest, including costs and administrative burdens of additional procedures. 180 Wash. 2d at 320-21.

The court then analyzed the statutory scheme in light of that test. The court agreed that the liberty interest at stake invoked due process requirements. Applying the second part of the test, the court determined that "Robust statutory guaranties . . . provide substantial protection against an erroneous deprivation of liberty." 180 Wash. 2d at 321. These guaranties included the requirement that the State show probable cause, the right to counsel at public expense, the right to present evidence on the respondent's behalf, the right to cross-examine adverse witnesses, the right to a jury of peers, the imposition on the State of the burden of proof beyond reasonable doubt, and the burden placed on the State to justify continued confinement by means of an annual review. Finally, the court found that the government had a compelling interest in treating sexual predators and protecting society from their actions. Housing of sexual predators in the possibly less secure facilities available for the more general population of people committed under the involuntary treatment act would pose a risk to the treatment population and increase the risk of escape, threatening the well-being of society at large. 180 Wash. 2d at 321-22.

8

At least seven other jurisdictions have reached conclusions consistent with that in Washington. See *Moore v. Superior Court*, 50 Cal. 4th 802, 829, 114 Cal. Rptr. 3d 199, 237 P.3d 530 (2010) (due process does not require mental competence of individual subject to commitment under Sexually Violent Predators Act); *In re Commitment of Weekly*, 2011 IL. App. (1st) 102276, §§ 52-53, 956 N.E.2d 634, 647 (2011) (establishing that fitness evaluation does not affect ability to receive a fair commitment trial because of numerous procedural safeguards against erroneous deprivation of liberty); *In re Det. of Cubbage*, 671 N.W.2d 442, 448 (Iowa 2003) (lack of pretrial competence evaluation causes no deprivation of due process rights); *Commonwealth v. Nieves*, 446 Mass. 583, 591, 846 N.E.2d 379 (2006) ("robust, adversary character" of commitment proceeding minimizes risk of erroneous commitment of person who is not sexually dangerous; due process is preserved through adversarial process); *State ex rel. Nixon v. Kinder*, 129 S.W.3d 5, 10 (Mo. App. 2003) (SVP determination, regardless of competency of respondent, not unconstitutional deprivation of liberty); *In re Commitment of Fisher*, 164 S.W.3d 637 (Tex. 2005) (difference between sexual predator commitment proceedings and conventional commitment proceedings does not make predator proceedings punitive; competency requirement for criminal proceedings inapplicable to civil commitments); *In re Commitment of Luttrell*, 312 Wis. 2d 695, 754 N.W.2d 249 (2008) (no right to competency evaluation before hearing on sexually violent person status; commitment is for treatment, not punishment, and due process concerns are remote).

The conclusions reached by these courts in other jurisdictions support the conclusion that we reach here. The court is sympathetic to the concerns expressed in the concurring opinion, but deems itself constrained by both the holdings of the United States Supreme Court and the language of the statute.

The crux of the problem with Sykes' appeal lies in the remedies available to him. The first is to free him from the jurisdiction of State penal and social services until he

9

should become competent to stand trial. This remedy is undesirable, because it releases an individual with violent tendencies into society.

The second remedy is to commit him for treatment as a mentally ill person subject to involuntary commitment under K.S.A. 59-2945 *et seq*. This remedy, while providing care and treatment for the mental illness, appears to beg the question presented in this appeal: he still ends up institutionalized without being competent to represent himself at a commitment hearing, albeit under a different statutory provision than the Sexually Violent Predator Act.

Although Sykes contends that the treatment for his condition as a sexual predator is not sufficiently targeted to treatment of his other disorders, the State is not required to choose between attacking every aspect of a public danger or not attacking any part of the danger at all. The legislature is free to recognize degrees of harm, and it may address restrictions to those cases where it deems the need to be most clear. *Hays*, 263 Kan. at 833. In this instance, the State has chosen treatment of the sexual predatory mental defect as having a priority over schizophrenia or other mental disorders.

The decision of the Court of Appeals is affirmed. The decision of the district court is affirmed.

\* \* \*

JOHNSON, J., concurring: Given the United States Supreme Court's majority holding in *Kansas v. Hendricks*, 521 U.S. 346, 369, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997), as confirmed by this court in *In re Care & Treatment of Hay*, 263 Kan. 822, 831, 953 P.2d 666 (1998), coupled with the statutory provision in K.S.A. 59-29a07(g), permitting a district court to determine whether a person committed the criminal acts

10

necessary to meet the definition of a sexually violent predator notwithstanding that person having been adjudicated incompetent to stand trial, I feel compelled to concur in the majority's result in this case. My decision is colored by the likelihood that Sykes will be institutionalized for the rest of his life in any event. I write separately to opine that the result reached by the majority is a much closer call than suggested by that opinion, so that in another case, the result could be different.

First, however, I pause to address the Court of Appeals panel's query:  "If persons who are so mentally ill that they cannot understand the nature of their commitment proceedings can be committed for care and treatment under K.S.A. 59-2945 *et seq.*, why should we treat persons believed to be sexually violent predators any differently?" *In re Care & Treatment of Sykes*, 49 Kan. App. 2d 859, 865, 316 P. 3d 811 (2014). Part of the answer to that question can be found in the panel's own opinion, where it recites the legislature's purpose in enacting the Kansas Sexually Violent Predator Act (SVPA), K.S.A. 59-29a01 *et seq*. That recitation identifies the target of the Act to be "'an extremely dangerous group of sexually violent predators who have a mental abnormality or personality disorder and who are likely to engage in repeat acts of sexual violence'"; it declares that the existing care and treatment procedures are inadequate to address "'the risks [the sexual predator recidivists] present to society'"; and it determines that the separate SVPA procedure is necessary in part "'for the potentially long-term control'" of the targeted dangerous recidivists. 49 Kan. App. 2d at 863-64. In other words, the legislature has acknowledged that the SVPA targets different people and serves a different function than the Care and Treatment Act for Mentally Ill Persons, K.S.A. 59-2945 *et seq*.

Later, the panel reveals a misconception that might well have led to the above-quoted query when it declares:  "As a sexually violent predator, Sykes is a member of the

11

subset of mentally ill persons who are subject to involuntary commitment." 49 Kan. App. 2d at 868. A quick glance at the respective statutory provisions belies that declaration.

To commit someone under the SVPA, the State has to prove that the person is a "sexually violent predator," as defined in K.S.A. 2014 Supp. 59-29a02(a), which "means any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence." The term, "mental abnormality," is further defined as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." K.S.A. 2014 Supp. 59-29a02(b). In contrast, the Care and Treatment Act for Mentally Ill Persons contains the following definitions:

> "(e) 'Mentally ill person' means any person who is suffering from a mental disorder which is manifested by a clinically significant behavioral or psychological syndrome or pattern and associated with either a painful symptom or an impairment in one or more important areas of functioning, and involving substantial behavioral, psychological or biological dysfunction, to the extent that the person is in need of treatment.
>
> "(f)(1) 'Mentally ill person subject to involuntary commitment for care and treatment' means a mentally ill person, as defined in subsection (e), who also lacks capacity to make an informed decision concerning treatment, is likely to cause harm to self or others, and whose diagnosis is not solely one of the following mental disorders: Alcohol or chemical substance abuse; antisocial personality disorder; intellectual disability; organic personality syndrome; or an organic mental disorder.
>
> (2) 'Lacks capacity to make an informed decision concerning treatment' means that the person, by reason of the person's mental disorder, is unable, despite conscientious efforts at explanation, to understand basically the nature and effects of hospitalization or treatment or is unable to engage in a rational decision-making process regarding

12

hospitalization or treatment, as evidenced by an inability to weigh the possible risks and benefits.

(3) 'Likely to cause harm to self or others' means that the person, by reason of the person's mental disorder:  (A) Is likely, in the reasonably foreseeable future, to cause substantial physical injury or physical abuse to self or others or substantial damage to another's property, as evidenced by behavior threatening, attempting or causing such injury, abuse or damage; except that if the harm threatened, attempted or caused is only harm to the property of another, the harm must be of such a value and extent that the state's interest in protecting the property from such harm outweighs the person's interest in personal liberty; or (B) is substantially unable, except for reason of indigency, to provide for any of the person's basic needs, such as food, clothing, shelter, health or safety, causing a substantial deterioration of the person's ability to function on the person's own.

"No person who is being treated by prayer in the practice of the religion of any church which teaches reliance on spiritual means alone through prayer for healing shall be determined to be a mentally ill person subject to involuntary commitment for care and treatment under this act unless substantial evidence is produced upon which the district court finds that the proposed patient is likely in the reasonably foreseeable future to cause substantial physical injury or physical abuse to self or others or substantial damage to another's property, as evidenced by behavior threatening, attempting or causing such injury, abuse or damage; except that if the harm threatened, attempted or caused is only harm to the property of another, the harm must be of such a value and extent that the state's interest in protecting the property from such harm outweighs the person's interest in personal liberty." K.S.A. 2014 Supp. 59-2946.

The statutes clearly reveal that a person could be subject to involuntary commitment as a sexually violent predator without meeting the statutory definition of a mentally ill person subject to involuntary commitment for care and treatment. For instance, if a person's sole diagnosed mental disorder is "antisocial personality disorder," that person is specifically *excluded* from the group of mentally ill persons who can be involuntarily committed. K.S.A. 2014 Supp. 59-2946(f)(1). Yet, if that personality disorder is one "which makes the person likely to engage in repeat acts of sexual violence," the person is specifically *included* in the group of sexually violent predators

13

who are subject to involuntary commitment "for control, care and treatment until such time as the person's . . . personality disorder has so changed that the person is safe to be at large." K.S.A. 2014 Supp. 59-29a02(a) and K.S.A. 2014 Supp. 59-29a07(a). Accordingly, because there are persons in the set of people designated as sexually violent predators who are not included in the set of people designated as mentally ill persons subject to involuntary commitment, designation as a sexually violent predator does not automatically make that person a member of the subset of mentally ill persons who are subject to involuntary commitment.

Clearly, then, the test for determining whether a person is a sexually violent predator subject to involuntary commitment differs significantly from the test to determine whether a person is a mentally ill person subject to involuntary commitment. Moreover, as acknowledged below, the treatment regimen in the SVPA program would not provide the care and treatment required under the Care and Treatment Act for Mentally Ill Persons, K.S.A. 59-2945 *et seq.* Those distinctions could well provide the basis for treating the procedures differently.

Turning to the merits, the majority emphasizes that proceedings under the SVPA are civil in nature, rendering inapplicable the criminal code provisions dealing with competency to stand trial, and that *Hendricks* held that the SVPA generally satisfies substantive due process requirements. But those declarations cannot end the analysis, because even a civil commitment constitutes a significant deprivation of liberty that requires the protection of due process of law. See *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979); *Jackson v. Indiana*, 406 U.S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972); *Humphrey v. Cady*, 405 U.S. 504, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972); *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967); *Specht v. Patterson*, 386 U.S. 605, 87 S. Ct. 1209, 18 L. Ed. 2d 326 (1967).

14

In the recent Washington case upon which the majority relies, *In re Detention of Morgan*, 180 Wash. 2d 312, 320-21, 330 P.3d 774 (2014), the court determined the extent of the protection due to a respondent in a civil involuntary commitment proceeding by utilizing the three-part test derived from *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The *Mathews* test looks at: (1) the liberty interest at stake; (2) the risk of erroneous deprivation of that liberty interest with the existing procedures and the probable value, if any, of additional safeguards; and (3) the government interest, including costs and administrative burdens of additional procedures. 180 Wash. 2d at 320-21. As the majority here notes, the *Morgan* majority acknowledged the significant liberty interest at stake but opined that "[r]obust statutory guaranties" provided protection against the risk of erroneous liberty deprivation and that the government had a compelling interest in treating sexual predators and protecting society from their actions. 180 Wash. 2d at 321-22.

But *Morgan* was not a unanimous decision, and the three dissenting justices evaluated the second and third *Mathews* factors more critically than the majority. The dissent opined that the purported safeguard of the right to counsel "is diluted by incompetency in an SVP proceeding to the same degree it is in a criminal proceeding," and "[w]hen the right to counsel—essential [to] the very right to mount a defense—is diluted, the procedure for detaining individuals as SVPs loses it constitutional footing." 180 Wash. 2d at 330 (Stephens, J., dissenting). I would submit that the same rationale applies to the purported safeguards of the right to present evidence on the respondent's behalf and the right to cross-examine adverse witnesses. Counsel is severely handicapped in effecting those rights on behalf of a client who cannot assist with the defense. For instance, Sykes' inability to provide his counsel with assistance as to what happened during the underlying crime greatly diminished the value of his counsel's ability to cross-examine the victims of the requisite underlying crime or to put on any mitigating evidence.

15

The *Morgan* dissent also faulted the majority for failing to analyze the value of additional safeguards, which is a piece of the second *Mathews* factor. The dissent opined that requiring competency in a sexually violent predator proceeding "brings significant value to the process," to-wit:

"It ensures that individuals are not subjected to involuntary detention based on the results of what is essentially a trial in abstentia. It ensures that juries are presented with an individual who can understand the nature of the proceedings against him. Perhaps most important, . . . it ensures that persons detained under [the Sexually Violent Predator Act] are amenable to the specific treatment modalities that serve the goals of the SVP scheme, rather than having their treatment undermined by coexisting psychiatric disorders better treated elsewhere." 180 Wash. 2d at 330 (Stephens, J., dissenting).

Similarly, the superficial declaration that the government has an interest in treating sex predators and protecting society from their actions does not go far enough. "[I]t is difficult to see how this interest is actually served when an incompetent person suffering severe psychiatric disturbances is committed to [the sexually violent predator program]," where there is no assurance that the program can address the person's mental illness. 180 Wash. 2d at 331 (Stephens, J., dissenting). Here, the majority appears to concede that Sykes will not receive the care and treatment he needs to address his underlying mental illness, if committed as a sexually violent predator. That fact is problematic because "[t]he scholarly research available suggests that an incompetent person will not be able to participate in SVP treatment." 180 Wash. 2d at 331 (Stephens, J., dissenting). Besides being an exercise in futility and another example of this State's disregard for its mentally ill citizens, warehousing mentally incompetent persons in the sexually violent predator program for the rest of their lives has constitutional implications because "[d]ue process requires that the nature of commitment bear some reasonable relation to the purpose for

16

which the individual is committed." *Foucha v. Louisiana*, 504 U.S. 71, 79, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992).

Further, *Morgan* is not the only foreign decision relied upon by the majority that had a seductive dissent. In *Moore v. Superior Court*, 50 Cal. 4th 802, 114 Cal. Rptr. 3d 199, 237 P.3d 530 (2010), the dissent opined that the touchstones of due process—notice and opportunity to be heard—are both violated when a respondent is incompetent. If a person is unable to understand the nature of the proceedings being prosecuted against him or her, how can that person receive effective notice of the nature, grounds, and consequences of the action? Likewise, if a person is unable to make or assist in a defense to the action, how is that person being provided with a reasonable opportunity to be heard? A hearing under those circumstances relegates the respondent to the role of a spectator, with no power to have an effect on the outcome. 50 Cal. 4th at 834 (Moreno, J., dissenting). I would submit that the respondent is not just a spectator, but an observer that does not understand the game that is being played, much the same as most Americans would be at a cricket match.

In sum, I believe this case stretches due process near, if not past, its breaking point.

17