Johnson, J.,
concurring: Given the United States Supreme Courts majority holding in Kansas v. Hendricks, 521 U.S. 346, 369, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997), as confirmed by *828 this court in In re Care & Treatment of Hay, 263 Kan. 822, 831, 953 P.2d 666 (1998), coupled with the statutory provision in K.S.A. 59-29a07(g), permitting a district court to determine whether a person committed the criminal acts necessary to meet the definition of a sexually violent predator notwithstanding that person having been adjudicated incompetent to stand trial, I feel compelled to concur in the majority’s result in this case. My decision is colored by the likelihood that Sykes will be institutionalized for the rest of his life in any event. I write separately to opine that the result reached by tire majority is a much closer call than suggested by that opinion, so that in another case, the result could be different.
First, however, I pause to address the Court of Appeals panel’s query: “If persons who are so mentally ill that they cannot understand the nature of their commitment proceedings can be committed for care and treatment under K.S.A. 59-2945 et seq., why should we treat persons believed to be sexually violent predators any differently?” In re Care & Treatment of Sykes, 49 Kan. App. 2d 859, 865, 316 P. 3d 811 (2014). Part of the answer to that question can be found in the panel’s own opinion, where it recites the legislature’s purpose in enacting the Kansas Sexually Violent Predator Act (SVPA), K.S.A. 59-29a01 et seq. That recitation identifies the target of the Act to be “‘an extremely dangerous group of sexually violent predators who have a mental abnormality or personality disorder and who are likely to engage in repeat acts of sexual violence’ it declares that the existing care and treatment procedures are inadequate to address “‘the risks [the sexual predator recidivists] present to society’ and it determines that the separate SVPA procedure is necessary in part “ ‘for the potentially long-term control’” of the targeted dangerous recidivists. 49 Kan. App. 2d at 863-64. In other words, the legislature has acknowledged that the SVPA targets different people and serves a different function than the Care and Treatment Act for Mentally Ill Persons, K.S.A. 59-2945 et seq.
Later, the panel reveals a misconception that might well have led to the above-quoted query when it declares: “As a sexually violent predator, Sykes is a member of the subset of mentally ill persons who are subject to involuntary commitment.” 49 Kan. App. 2d *829 at 868. A quick glance at the respective statutory provisions belies that declaration.
To commit someone under the SVPA, the State has to prove that the person is a “sexually violent predator,” as defined in K.S.A. 2014 Supp. 59-29a02(a), which “means any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence.” The term, “mental abnormality,” is further defined as “a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others.” K.S.A. 2014 Supp. 59-29a02(b). In contrast, the Care and Treatment Act for Mentally Ill Persons contains the following definitions:
“(e) ‘Mentally ill person’ means any person who is suffering from a mental disorder which is manifested by a clinically significant behavioral or psychological syndrome or pattern and associated with either a painful symptom or an impairment in one or more important areas of functioning, and involving substantial behavioral, psychological or biological dysfunction, to the extent that the person is in need of treatment.
“(f)(1) ‘Mentally ill person subject to involuntary commitment for care and treatment’ means a mentally ill person, as defined in subsection (e), who also lacks capacity to make an informed decision concerning treatment, is likely to cause harm to self or others, and whose diagnosis is not solely one of the following mental disorders: Alcohol or chemical substance abuse; antisocial personality disorder; intellectual disability; organic personality syndrome; or an organic mental disorder.
(2) ‘Lacks capacity to make an informed decision concerning treatment’ means that the person, by reason of the person’s mental disorder, is unable, despite conscientious efforts at explanation, to understand basically the nature and effects of hospitalization or treatment or is unable to engage in a rational decision-making process regarding hospitalization or treatment, as evidenced by an inability to weigh tire possible risks and benefits.
(3) ‘Likely to cause harm to self or others’ means that the person, by reason of the person’s mental disorder: (A) Is likely, in tire reasonably foreseeable future, to cause substantial physical injury or physical abuse to self or others or substantial damage to another’s property, as evidenced by behavior threatening, attempting or causing such injury, abuse or damage; except that if the harm threatened, attempted or caused is only harm to the property of another, the harm must be of such a value and extent tirat the state’s interest in protecting the property from *830 such harm outweighs the person’s interest in personal liberty; or (B) is substantially unable, except for reason of indigency, to provide for any of the person’s basic needs, such as food, clothing, shelter, health or safety, causing a substantial deterioration of the person’s ability to function on the person’s own.
“No person who is being treated by prayer in the practice of the religion of any church which teaches reliance on spiritual means alone through prayer for healing shall be determined to be a mentally ill person subject to involuntary commitment for care and treatment under this act unless substantial evidence is produced upon which the district court finds that the proposed patient is likely in the reasonably foreseeable future to cause substantial physical injury or physical abuse to self or others or substantial damage to another’s property, as evidenced by behavior threatening, attempting or causing such injury, abuse or damage; except that if the harm threatened, attempted or caused is only harm to the property of another, the harm must be of such a value and extent that the state s interest in protecting the property from such harm outweighs the person’s interest in personal liberty.” K.S.A. 2014 Supp. 59-2946.
The statutes clearly reveal that a person could be subject to involuntary commitment as a sexually violent predator without meeting the statutory definition of a mentally ill person subject to involuntary commitment for care and treatment. For instance, if a persons sole diagnosed mental disorder is “antisocial personality disorder,” that person is specifically excluded from the group of mentally ill persons who can be involuntarily committed. K.S.A. 2014 Supp. 59-2946(f)(l). Yet, if that personality disorder is one “which makes the person likely to engage in repeat acts of sexual violence,” the person is specifically included in the group of sexually violent predators who are subject to involuntary commitment “for control, care and treatment until such time as the person’s . . . personality disorder has so changed that the person is safe to be at large.” K.S.A. 2014 Supp. 59-29a02(a) and K.S.A. 2014 Supp. 59-29a07(a). Accordingly, because there are persons in the set of people designated as sexually violent predators who are not included in the set of people designated as mentally ill persons subject to involuntary commitment, designation as a sexually violent predator does not automatically make that person a member of the subset of mentally ill persons who are subject to involuntary commitment.
Clearly, then, the test for determining whether a person is a sexually violent predator subject to involuntaiy commitment differs significantly from the test to determine whether a person is a *831 mentally ill person subject to involuntary commitment. Moreover, as acknowledged below, the treatment regimen in the SVPA program would not provide the care and treatment required under the Care and Treatment Act for Mentally Ill Persons, K.S.A. 59-2945 et seq. Those distinctions could well provide the basis for treating the procedures differently.
Turning to the merits, the majority emphasizes that proceedings under the SVPA are civil in nature, rendering inapplicable the criminal code provisions dealing with competency to stand trial, and that Hendricks held that the SVPA generally satisfies substantive due process requirements. But those declarations cannot end the analysis, because even a civil commitment constitutes a significant deprivation of liberty that requires the protection of due process of law. See Addington v. Texas, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979); Jackson v. Indiana, 406 U.S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972); Humphrey v. Cady, 405 U.S. 504, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972); In re Gault, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967); Specht v. Patterson, 386 U.S. 605, 87 S. Ct. 1209, 18 L. Ed. 2d 326 (1967).
In the recent Washington case upon which the majority relies, In re Detention of Morgan, 180 Wash. 2d 312, 320-21, 330 P.3d 774 (2014), the court determined the extent of the protection due to a respondent in a civil involuntary commitment proceeding by utilizing the three-part test derived from Mathews v. Eldridge, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The Mathews test looks at: (1) the liberty interest at stake; (2) the risk of erroneous deprivation of that liberty interest with the existing procedures and the probable value, if any, of additional safeguards; and (3) the government interest, including costs and administrative burdens of additional procedures. 180 Wash. 2d at 320-21. As the majority here notes, the Morgan majority acknowledged the significant liberty interest at stake but opined that “[rjobust statutory guaranties” provided protection against the risk of erroneous liberty deprivation and that the government had a compelling interest in treating sexual predators and protecting society from their actions. 180 Wash. 2d at 321-22.
But Morgan was not a unanimous decision, and the three dissenting justices evaluated the second and third Mathews factors *832 more critically than the majority. The dissent opined that the purported safeguard of the right to counsel “is diluted by incompetency in an SVP proceeding to the same degree it is in a criminal proceeding,” and “[w]hen the right to counsel—essential [to] the very right to mount a defense—is diluted, the procedure for detaining individuals as SVPs loses it constitutional footing.” 180 Wash. 2d at 330 (Stephens, J., dissenting). I would submit that the same rationale applies to the purported safeguards of the right to present evidence on the respondent’s behalf and tire right to cross-examine adverse witnesses. Counsel is severely handicapped in effecting those rights on behalf of a client who cannot assist with the defense. For instance, Sykes’ inability to provide his counsel with assistance as to what happened during the underlying crime greatly diminished the value of his counsel’s ability to cross-examine the victims of the requisite underlying crime or to put on any mitigating evidence.
The Morgan dissent also faulted the majority for failing to analyze the value of additional safeguards, which is a piece of the second Mathews factor. The dissent opined that requiring competency in a sexually violent predator proceeding “brings significant value to the process,” to-wit:
“It ensures that individuals are not subjected to involuntary detention based on tire results of what is essentially a trial in abstentia. It ensures that juries are presented with an individual who can understand the nature of tire proceedings against him. Perhaps most important,... it ensures that persons detained under [the Sexually Violent Predator Act] are amenable to the specific treatment modalities that serve the goals of the SVP scheme, rather than having their treatment undermined by coexisting psychiatric disorders better treated elsewhere.” 180 Wash. 2d at 330 (Stephens, J., dissenting).
Similarly, the superficial declaration that the government has an interest in treating sex predators and protecting society from their actions does not go far enough. “[I]t is difficult to see how this interest is actually served when an incompetent person suffering severe psychiatric disturbances is committed to [the sexually violent predator program],” where there is no assurance that the program can address the person’s mental illness. 180 Wash. 2d at 331 (Stephens, J., dissenting). Here, the majority appears to concede that Sykes *833 will not receive the care and treatment he needs to address his underlying mental illness, if committed as a sexually violent predator. That fact is problematic because “[t]he scholarly research available suggests that an incompetent person will not be able to participate in SVP treatment.” 180 Wash. 2d at 331 (Stephens, J., dissenting). Besides being an exercise in futility and another example of this State s disregard for its mentally ill citizens, warehousing mentally incompetent persons in the sexually violent predator program for the rest of their lives has constitutional implications because “[d]ue process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed.” Foucha v. Louisiana, 504 U.S. 71, 79, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992).
Further, Morgan is not the only foreign decision relied upon by the majority that had a seductive dissent. In Moore v. Superior Court, 50 Cal. 4th 802, 114 Cal. Rptr. 3d 199, 237 P.3d 530 (2010), the dissent opined that the touchstones of due process—notice and opportunity to be heard—are both violated when a respondent is incompetent. If a person is unable to understand the nature of the proceedings being prosecuted against him or her, how can that person receive effective notice of the nature, grounds, and consequences of the action? Likewise, if a person is unable to make or assist in a defense to tire action, how is that person being provided with a reasonable opportunity to be heard? A hearing under those circumstances relegates the respondent to the role of a spectator, with no power to have an effect on the outcome. 50 Cal. 4th at 834 (Moreno, J., dissenting). I would submit that the respondent is not just a spectator, but an observer that does not understand the game that is being played, much the same as most Americans would be at a cricket match.
In sum, I believe this case stretches due process near, if not past, its breaking point.