
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35476-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONNA REBECCA PERRY, aka | ) | UNPUBLISHED OPINION |
| DOUGLAS ROBERT PERRY, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Donna Perry appeals her[1] convictions for three counts of first

degree premeditated murder, with the aggravating circumstance in each case that the

murder was part of a common scheme or plan involving more than one victim. We

---

[1] The crimes on appeal were committed while Perry was living as a man: Douglas. Most of the investigation as well as the court proceedings occurred after Perry had undergone gender reassignment and become Donna. Consistent with how the witnesses referred to Perry, we use masculine pronouns when describing Perry before 2000 and feminine pronouns when describing Perry after the gender reassignment. We depart from our usual practice of using "Mr." or "Ms." in Perry's case, in the interest of clarity. No disrespect is intended.

affirm the convictions but remand with directions to strike a criminal filing fee from

Perry's judgment and sentence.

FACTS AND PROCEDURAL BACKGROUND

Between February and May 1990, Yolanda Sapp, Nickie Lowe, and Kathleen

Brisbois were murdered. All worked as prostitutes, and all were found dead along the

Spokane River with gunshot wounds, the first two within the Spokane City limits and the

third in what was then an unincorporated part of the county. The three women knew each

other. The Spokane Police Department and the Spokane County Sheriff's Office came to

believe these were serial murders, because of the women's similar lives, the perpetrator's

use of a small caliber firearm, and the bodies' location near the river. The departments

conducted a joint investigation. Many suspects were considered, including Robert Yates

and, for a brief time, the Green River killer, but evidence did not support charges against

any suspect. In the mid-1990s the investigations into the murders went cold.

Following improvements in DNA[2] analysis, law enforcement renewed review of

evidence of the murders and in 2008 submitted several items of evidence for DNA

testing. A forensic scientist was able to develop a male DNA profile from blood found

under one of Ms. Brisbois's fingernails and entered it into the Combined DNA Index

System (CODIS) in 2009. There was no immediate hit.

---

[2] Deoxyribonucleic acid.

2

Several years later, however, CODIS returned a potential hit for the blood sample: Douglas Perry, also known as Donna Perry. The gender disparity in the names was later explained by the fact that in 2000, Douglas Perry underwent gender reassignment surgery in Thailand and became Donna Perry. Perry had not previously been identified as a suspect in the murders.

Investigation into Perry's background revealed prior associations with prostitutes in Spokane and prior contacts with law enforcement. He could be placed in the Spokane area in 1990 based on a police report documenting contact with Perry for soliciting a prostitute and a report from NCIC[3] that the Spokane Police Department ran his name in February 1990.

The investigation revealed that in 1994, law enforcement obtained a search warrant to search Perry's house on East Dalton Avenue in Spokane for weapons, which he could not legally possess.[4] A search conducted with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) produced 33 firearms and a substantial amount of ammunition, all of which was confiscated. During the search, ATF Agent Lance Hart spoke with Perry, whom he described as extremely knowledgeable about firearms and very protective of the ones in his possession. Asked by Hart how he obtained money to

---

[3] The National Crime Information Center.
[4] As Perry admitted when later interviewed by detectives, he had at one time held a federal firearm license, but lost it when an unregistered machine gun was found in his possession.

purchase firearms, Perry responded that he was a woman trapped inside a man's body, and made money by dressing up as a woman and engaging in prostitution. Among firearms confiscated from Perry's house were three that used .22 caliber bullets, the type that had been recovered from the bodies of Ms. Lowe and Ms. Brisbois. One was a 10/22 Ruger rifle. Police later learned that Perry had purchased two .22 caliber pistols in the 1970s that were not confiscated by ATF in 1994, one being an Iver Johnson pistol. A firearm expert later determined that the bullets and fragments recovered from the bodies of Ms. Lowe and Ms. Brisbois could have been fired by a 10/22 Ruger rifle or an Iver Johnson pistol.

It was also determined that in 1998, a prostitute reported her concern to a police officer about a "date" she had just concluded at Perry's home on East Empire Avenue in Spokane that she would later describe as "the creepiest thing I've ever been through in my life." Report of Proceedings (RP) at 984.[5] She described "mannequins and crossbows and weapons and things everywhere in his house, everywhere." *Id.* While voicing her concern to the officer, Perry drove by and the prostitute pointed him out. The police officer stopped Perry's car and in patting him down, located two knives and a stun gun. In a search of the car to which Perry consented, the officer found papers explaining

---

[5] Unless otherwise noted, report of proceedings citations are to the report of proceedings that begins with proceedings on October 12, 2016, and includes testimony given during the June 2017 trial.

how to obtain gender reassignment surgery. The officer took no action against Perry other than the stop and search.

In 1998, a Spokane police officer pulled Perry over for a traffic stop at 1:30 in the morning. Perry was hostile during the stop and denied any involvement in prostitution. Once again, he was carrying a knife and a stun gun on his belt.

In 2012, a complaint brought Perry to the ATF's attention again, and in a search of Perry's East Empire Avenue house, ATF and local law enforcement confiscated 12 firearms and a significant amount of ammunition. Among the firearms confiscated was another Ruger 10/22 .22 caliber rifle. Perry was taken into federal custody. All of the firearms confiscated from Perry's house in 2012 proved to have been manufactured in 1997 or later.

A firearm trace of the Ruger 10/22 .22 caliber rifles confiscated from Perry's homes in 1994 and 2012 determined that their retail purchasers had been two brothers: Bruce and Mark Massengale, respectively. The Massengale brothers were interviewed and both proved to be friends of Perry's before and after Perry's gender reassignment surgery. Bruce had allowed Perry to live with him for a time. When interviewed by law enforcement, the brothers reported that Perry had lived with Clairann Gallaway in 1990 but that she later left Spokane for parts unknown.

Law enforcement eventually learned that Ms. Gallaway was in Los Angeles, suffered from mental illness, and was the ward of a guardian who would not allow her to

be interviewed. Spokane officers informed the Los Angeles Police Department of their hope to interview Ms. Gallaway if the guardianship was terminated, but they were eventually notified that Ms. Gallaway had passed away. An investigation of Ms. Gallaway's background revealed that she had been a prostitute and associated with Ms. Sapp, Ms. Lowe, and Ms. Brisbois. A search of criminal records produced four photographs taken when she was booked into the Spokane County Jail. Two were taken on February 21 and March 15, 1990—the day before Ms. Sapp's body was found and the day Ms. Brisbois's body was found, respectively. Police theorized that perhaps Perry robbed the two women to obtain bail money. Mark Massengale remembered Ms. Gallaway getting arrested a few times and that Perry, who lived on social security, would somehow "[f]ind the money to bail her out." RP at 1476.

In November 2012, county Sheriff's Detective James Dresback and Spokane Police Detective Mark Burbridge arranged to visit Perry, who was being held as a federal inmate at the Spokane County Jail. They were armed with a search warrant for Perry's DNA. At the outset of the interview, the detectives told Perry they were working on old cases, wanted to see if Perry could help them, and needed to first advise her of her rights. Perry stated "I should probably have an attorney here if you're going to question me about something." Ex. P-152 at 5.[6]

---

[6] At trial, the videotaped interview of Perry (Ex. P-151) was played for the jury. Before it was played, jurors were provided with copies of a transcript (Ex. P-152), with

6

Detective Dresback proceeded to read Perry her *Miranda*[7] rights and then asked if she wanted to answer questions. Perry again told the detectives "I think I should have a lawyer here if you're going to ask questions." Ex. P-152 at 6. Detective Dresback, who had been reading the rights from a card, pointed out to Perry that he had noted her response on the card, and Perry signed the card. *Id.*; Ex. P-151, at 7 min., 43 sec. to 8 min., 36 sec.

Detective Dresback then stated, "Okay, we have another order of business we have to take care of today," and told Perry he had a search warrant to obtain a sample of her DNA. Ex. P-152 at 6. When Perry asked, "in conjunction with what?" the detective answered that it was "in conjunction with some old cases that we're investigating." *Id.* at 6-7. When Perry asked what the detectives meant by "old cases" the following exchange occurred:

| | |
|---|---|
| Dresback: | Well, I want to make sure that you want to talk to me about this, okay? |
| Perry: | Well, I should have a lawyer here if you're going to take DNA and all of this. |
| Burbridge: | Your lawyer doesn't get to be here while we serve the search warrant. |

the trial court explaining that the transcript was "provided to you as a courtesy to help you because there are some spots that are possibly inaudible" and to "please make sure you are also paying attention to the video itself and don't just read the script." RP at 1365. For convenience, we most often cite to pages of exhibit P-152 rather than to time frames in the videotape.
    [7] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

*Id.* at 7.  Perry asked why the detectives wanted her DNA and Detective Burbridge

responded that they had a search warrant for first degree murder, and that they believed

Perry had information about the murder.  When Perry asked additional questions

Detective Burbridge told Perry:

> Burbridge: And again, you wanted a lawyer so I can't talk to you.  If you want to talk to us then . . .
>
> Perry: Yeah, I need a lawyer for something like this.
>
> Burbridge: . . . then you need to tell me that.

*Id.* at 8.  Perry then repeated, "Yeah, I think I better have a lawyer.  This is crazy."  *Id.*

Perry was provided with the search warrant but said she couldn't read it without

glasses, so Detective Dresback read it to her.  He then instructed her how to swab her

cheek to provide samples.  Handing the swabs back to the detective, Perry asked, "Am I

being accused of murder or something?" and Detective Dresback responded that she was

the prime suspect in multiple murders.  *Id*. at 9.  After Perry stated that she did not

understand what was going on, the following exchange occurred:

> Burbridge: Again, Donna.  We can't talk to you.  You've asked for a lawyer.  Unless you tell us you want to sit down and talk.
>
> Dresback: And you do understand that the rights of you[ ] having an attorney and your right to remain silent, these are your rights.  All they do is restrict me, they don't restrict you in any way.  You have the right to talk and you have the right to not talk, okay?  So, I'm absolutely going to honor your right to an attorney at this time.  Which is why we're not really, freely, discussing the whole thing with ya.  Um, but it is your right.

*Id*. Detective Dresback then said that he was going to tape up the box with the DNA samples and would be back with a copy of a return for Perry.

The detectives left the room, returning five minutes later. After being given her copy of the search warrant, Perry told the detectives "[t]ell me what's going on. I don't understand a thing. I need a lawyer or somebody to explain what actually is going on." *Id*. at 11. The detectives gave her a brief description of the crimes and the CODIS hit that led them to her. Perry asked additional questions and expressed that she was paranoid and "in a total panic mode" and had "a million questions." *Id*. at 12. Detective Dresback responded:

| Dresback: | Well, I have about a thousand. So, you've got more than me. And . . . and like I said before, it's your right if you at any time you decide that you want to discuss this, you have the right to do that. But until that happens, I'm not too terribly comfortable asking you anything about it, to clarify things. So, that's where we're at. Do you have any other questions for me? |
|---|---|
| Perry: | What are the names of these people? |
| Burbridge: | I'm not comfortable going down that road. |
| Dresback: | Not yet. |

*Id.* at 12-13. Perry expressed again how upset she was about being a suspect. The detectives said they were going to give her time to finish the soda they had provided and would be back to take her back to the jail.

9

Detective Dresback returned six minutes later and gave Perry his business card, telling her to let him know if she decided she wanted to talk. Perry reiterated how upset she was, including to ask for the detective's pistol and one round so that she could "finish it," but then said, "Let's talk. Let's sit down and work this out of my head." *Id.* at 14. Detective Burbridge entered the room and Detective Dresback said that before they could talk, he needed to reread her rights. He reread Perry her rights and asked her if she understood them, to which she answered, "Yes." *Id.* at 15. Asked if she wanted to answer his questions, Perry said, "I'll try to answer your questions." *Id.* Told that the detective needed her signature on his advice of rights card, Perry signed it.

During the questioning that followed, Perry told the detectives "I did pick up some prostitutes, yes. But I always let them out and they were alive and well when I let them out." *Id.* at 16.

Notwithstanding Perry's denials, Detective Burbridge suggested that something made Perry stop killing, and the following exchange occurred:

| | |
|---|---|
| Burbridge: | Here's . . . here's the real thing the question to me is, people that kill people, multiple people over periods of time, they generally keep going once it starts. |
| Perry: | Yeah. |
| Burbridge: | So the question to me is [sic] a law enforcement officer who's studied this in depth? |
| Perry: | Um hm. |
| Burbridge: | What made Donna stop? So then I asked myself . . . |

| | |
|---|---|
| Perry: | Douglas didn't stop.  Donna stopped it.  The gender change operation. |
| Burbridge: | Do you think that's what stopped it? |
| Perry: | I have . . . yeah . . . I'm convinced of it. |
| Dresback: | I hadn't thought of that.  That's a good question. |
| Burbridge: | Well, here's . . . here's another one I'm wondering too, is where is she? |
| Dresback: | There's no more testosterone to fuel the anger. |

*Id.* at 46-47.

Shortly thereafter, as the detectives continued to question Perry as if she had committed the murders, she stated:

| | |
|---|---|
| Perry: | I'm not going to admit I killed anybody.  I didn't.  Donna has killed nobody. |
| Burbridge: | Doug did? |
| Perry: | I don't know if Doug did or not.  It's 20 years ago and I have no idea whether he did or didn't. |

*Id.* at 48.  While Perry denied many times in the remainder of the interview that Doug had murdered any of the victims, she later repeated that she "got rid of violence with the sex change operation." *Id.* at 52.

The DNA sample obtained from Perry was analyzed by the Washington State Patrol Crime Laboratory and was compared with other evidence obtained from the murder victims and their surroundings.  It proved to be a definitive match to the blood found under Ms. Brisbois's fingernail; a match, but weaker, to a floral blanket found near Ms. Sapp's body; and a weak match to a vaginal swab of Ms. Brisbois.

11

In 2013, law enforcement learned that Perry had made incriminating statements to Chero Everson, a fellow inmate of Perry's at a federal prison in Texas. Detectives Dresback and Burbridge traveled to Texas in June 2013 to interview her. According to Ms. Everson, although she and Perry were only incarcerated together for about a month and a half, Perry came to trust her and even talked about the two marrying. Ms. Everson said Perry said she had been diagnosed with schizophrenia and was a sociopath, that guns and ammunition were her hobbies, and that she had made money by being a contract killer. Perry also reportedly told Ms. Everson that she had killed prostitutes, initially telling Ms. Everson she had killed 9 prostitutes but later claiming to have killed between 20 and 30. Perry reportedly described the prostitutes to Ms. Everson as "nothing. They were nobodies. They were pond scum." RP at 1522. According to Ms. Everson, Perry said she was jealous of the prostitutes because "they could have families." *Id.*

Ms. Everson would eventually testify at Perry's trial that Perry told her "that becoming a woman was a disguise to get the heat . . . off of him,[8] and that nobody would think that an elderly lady with mental illness would ever get caught." RP at 1517. Perry reportedly told Ms. Everson he "would pick a target and he would study their, I

---

[8] Ms. Everson used male pronouns in describing Perry. When asked by detectives why, she answered that it was because Perry told her that the reason for the sex change operation was to avoid detection. She said she had "interact[ed]" with Perry "as a male." RP at 1517.

guess their moves, what they did, where they went and then he would execute them."

RP at 1526. According to Ms. Everson, Perry claimed to have killed the prostitutes in a

vehicle by a river, and then kicked their bodies out of the vehicle and left them behind.

Perry reportedly claimed to know how to dispose of evidence, and told Ms. Everson law

enforcement had unknowingly destroyed some of the firearms Perry used to commit

murders.

Ms. Everson testified that she received nothing in exchange for her information

and testimony against Perry. She testified that her dealings with Perry ended after she

informed staff she was afraid of Perry and staff placed the two in separate units.

The State charged Perry with three counts of premeditated first degree murder,

with the aggravating circumstance that the murder was part of a common scheme or plan

involving more than one victim. When officers traveled to Texas to bring Perry to

Spokane for trial, Perry reportedly told officers during the flight, "'I'm never going to get

out of this,'" "'instead of jail, I hope they send me to Eastern State Hospital,'" "'I'm not

violent now,'" and that the plane ride would be "the last time she would be outside of

concrete walls." RP at 1562-63, 1569.

In addition to the foregoing matters, evidence at trial included the following

evidence specific to the three victims:

As to Yolanda Sapp, evidence that her body, naked except for some jewelry, was

found on the morning of February 22, 1990, on the north Spokane River bank. A

13

forensic expert testified to a common profile between Perry's DNA and DNA found on the floral blanket found near Ms. Sapp's body and that "one in 3300 men at most, probably less than that, would also share that profile." RP at 1666. Ms. Sapp had scrapes on her forehead and on one of her armpits, and three gunshot wounds to her back from small caliber bullets. The medical examiner concluded that the bullets entered Ms. Sapp's back and exited through her front side. They were not recovered.

As to Nickie Lowe, evidence that her body was found on the morning of March 25, 1990, under the Greene Street Bridge. Her body was positioned with her legs up on the guardrail and her back on the ground. Her pants had been pulled down to her knees and her top had been pulled up, exposing her genital area and her trunk up to a breast. She had marks and bruising on her backside suggesting that she had been dragged or pulled to the guardrail. She had a single gunshot wound to her chest; the bullet, which was recovered, was a .22 caliber bullet. The medical examiner concluded from tears and bloodstains on Ms. Lowe's clothing that she was normally clothed when she was shot, while the markings and bruising on her body occurred after her pants had been pulled down and her top pulled up.

A wallet containing Ms. Lowe's driver's license was reported found in a dumpster on Sprague Avenue. Police searched the dumpster and retained several items for testing. A fingerprint lifted from a tube of lubricating jelly found in the dumpster was a match for Perry's fingerprint.

As to <u>Kathleen Brisbois,</u> evidence that her body was found in the late afternoon on May 15, four or five feet down an embankment by the river. A forensic expert testified to the definitive match of Perry's DNA to DNA from the blood found under Ms. Brisbois's fingernail and the weaker match of his DNA to DNA from her vaginal swab. Ms. Brisbois's autopsy revealed that she had been struck at least eight times in the head with a blunt object and sustained three gunshot wounds to her head, chest, and right shoulder area, all inflicted from close range.

Two bullet fragments were recovered during Ms. Brisbois's autopsy. Both were from .22 caliber bullets and one fragment had the same class characteristics as the bullet recovered from Ms. Lowe's body. The other bullet fragment from Ms. Brisbois's body had different class characteristics, which a forensic expert suggested could be explained by the bullets being fired through different barrels of one or more guns.

At the conclusion of the several week trial, the jury found Perry guilty as charged, answering yes to special verdict forms asking if the murders had been part of a common scheme or plan. The trial court sentenced Perry to three life sentences, to be served consecutively, without the possibility of parole or early release. It imposed $710 in legal financial obligations (LFOs) consisting of the $500 crime victim assessment fee, the $100 DNA collection fee, and the $110 criminal filing fee in effect when the crimes were committed. Additional factual and procedural background is provided in connection with specific assignments of error.

ANALYSIS

Perry assigns error to (1) the trial court's ruling that Perry's statements made during the interview by Detectives Dresback and Burbridge were admissible at trial, (2) the denial of a motion by Perry to sever trial of the murder counts, (3) the sufficiency of the evidence to support the common scheme or plan aggravator, (4) an asserted public trial violation occurring when initial instructions were read to prospective jurors in the jury lounge, and (5) denial of Perry's motion for a mistrial.[9] Perry also presents motions challenging the imposition of certain costs in the trial court and on appeal. We address the assignments of error in the order presented.

I.      THE TRIAL COURT PROPERLY ADMITTED PERRY'S STATEMENTS FROM THE
        NOVEMBER 2012 INTERVIEW

Perry contends that the trial court improperly admitted her statements made during the interview by Detectives Dresback and Burbridge because she had unequivocally invoked her right to counsel. A suspect's decision to *cut off questioning* does not raise a presumption that she is unable to proceed without a lawyer's advice, but an *unequivocal request for a lawyer* does. *Arizona v. Roberson*, 486 U.S. 675, 683, 108 S. Ct. 2093, 100 L. Ed. 2d 704 (1988) (citing *Michigan v. Mosley*, 423 U.S. 96, 101 n.7, 96 S. Ct. 321, 46

---

[9] Perry also included an assignment to cumulative error that we need not address, having found only one harmless error.

L. Ed. 2d 313 (1975)).[10]  The presumption raised by a suspect's request for a lawyer is that she considers herself unable to deal with the pressures of custodial interrogation without legal assistance.  *Id.*  After a request for a lawyer, "reinterrogation may only occur if 'the accused himself initiates further communication, exchanges, or conversations with the police.'"  *Id.* at 680-81 (quoting *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)).

The State argues that Perry's requests for a lawyer were equivocal, and alternatively that she initiated further conversation about the investigation.[11]  The trial court, which made a record of the fact that it watched the entire videotaped interview of Perry, appears to have found her statements admissible because she initiated the further conversation about the investigation.  Among the court's findings of fact were the following:

> 7.    Initially [during the November 15, 2012 interview], Ms. Perry stated that she thought she should consult with an attorney.
>
> 8.    The detectives did not question Ms. Perry, given her request.  The detectives did retrieve her DNA pursuant to a search warrant previously authorized.

---

[10] When a suspect asserts the right to cut off questioning, the police may honor that right by ceasing the interrogation and resuming questioning only after the passage of a significant period of time, the provision of a fresh set of warnings, and restricting the interrogation to a crime that had not been the subject of the earlier interrogation. *Roberson*, 486 U.S. at 683 (citing *Mosley*, 423 U.S. at 106).

[11] The State makes a second alternative argument that any error was harmless, which we need not address.

9. Ms. Perry continued to ask questions of the detectives. The detectives advised that they couldn't speak with her regarding her concerns because she had wanted a lawyer. The detectives provided Ms. Perry with their business card if she wanted to contact them in the future.

10. Upon telling Ms. Perry that she would be transported back to the jail, Ms. Perry stated "No. You don't need to do that. I want to talk to you, let's talk."

11. The detectives then readvised Ms. Perry of her rights, which she again stated she understood, and agreed to waive.

12. The detectives did not force or coerce the conversation on November 15, 2012. They remained professional for the entirety of the interview. The detectives did not raise their voices or make any sort of threats during the interview.

Clerk's Papers (CP) at 205. The trial court concluded "Ms. Perry was properly advised of her rights and . . . freely and voluntarily waived those rights and chose to speak with law enforcement" during the interview. CP at 206.

"[F]indings of fact entered following a CrR 3.5 hearing will be verities on appeal if unchallenged, and, if challenged, they are verities if supported by substantial evidence in the record." *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). We review de novo whether "the trial court derived proper conclusions of law from its findings of fact." *State v. Pierce*, 169 Wn. App. 533, 544, 280 P.3d 1158 (2012).

Perry does not assign error to any of the trial court's findings of fact. She nonetheless argues on appeal that the detectives' conduct was manipulative and their interrogation never ceased, because "interrogation" includes words or actions that are

18

reasonably likely to elicit an incriminating response. But one of the findings to which no error is assigned, and that is a verity on appeal, is that "[t]he detectives did not question Ms. Perry, given her request [to consult with an attorney]." CP at 205. And the detectives' statements to Perry before she said she wished to talk did not elicit incriminating statements. While the information they provided piqued Perry's curiosity to the point that she wanted to talk, that does not violate the Fifth Amendment right of a suspect whose decision to answer questions is voluntary. Perry does not assign error to the trial court's finding that the detectives did not force or coerce the conversation.

In *Roberson*, the Supreme Court states, "As we have made clear, any further communication, exchanges, or conversations with the police that the suspect himself initiates, are perfectly valid." 486 U.S. at 687 (internal quotation marks omitted). The trial court's findings support its conclusion that Perry's statements were admissible.

II.    PERRY DOES NOT DEMONSTRATE THAT THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING HER MOTION TO SEVER THE THREE COUNTS

Perry next assigns error to the trial court's denial of her motion to sever the counts for separate trial.

Joinder of offenses in a single charging document as was done here is proper when the offenses are of the same character or are based on connected acts. CrR 4.3(a). A defendant may move to sever offenses, which is appropriate if "the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each

19

offense." CrR 4.4(b). The decision whether to sever charges is reviewed for abuse of discretion. *State v. Kalakosky*, 121 Wn.2d 525, 536, 852 P.2d 1064 (1993). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Separate trials are disfavored. *State v. McDaniel*, 155 Wn. App. 829, 860, 230 P.3d 245 (2010). The defendant bears the burden of demonstrating in her motion to sever that "a trial involving [multiple] counts would be so manifestly prejudicial as to outweigh the concern for judicial economy." *State v. Bythrow*, 114 Wn.2d 713, 718, 790 P.2d 154 (1990). "In determining whether the potential for prejudice requires severance, a trial court must consider (1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial." *State v. Russell*, 125 Wn.2d 24, 63, 882 P.2d 747 (1994).

Perry recognizes that the second and third considerations did not present a potential for prejudice, but argues that there were significant differences in the strength of the State's evidence for the three murders and that evidence of the murders would not have been cross admissible in separate trials. We agree that the State's evidence specific to individual murders varied in strength. But Perry fails to address strong evidence that was common to all three counts, including Ms. Everson's testimony that Perry confessed

to killing multiple prostitutes—testimony that made evidence of the other murders cross admissible as corroboration of Perry's confession.

"ER 404(b) prohibits the use of evidence of other crimes, wrongs, or acts to prove the character of a person in order to show action in conformity therewith." *State v. Slocum*, 183 Wn. App. 438, 448, 333 P.3d 541 (2014). It provides a list of nonpropensity purposes for which evidence of other crimes, wrongs or acts can be offered. The list is not exclusive. *State v. Baker*, 162 Wn. App. 468, 473, 259 P.3d 270 (2011). To admit evidence of another crime, wrong or act for a nonpropensity purpose, the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect. *Id.* We can affirm the trial court on any basis supported by the record. *State v. Norlin*, 134 Wn.2d 570, 582, 951 P.2d 1131 (1998).

Courts from other jurisdictions applying their corollary to ER 404(b) have held that evidence of other crimes or acts is admissible for the purpose of corroborating evidence that itself has a legitimate nonpropensity purpose. *E.g.*, *United States v. Bowie*, 232 F.3d 923, 933 (D.C. Cir. 2000) (citing federal cases). By way of example, in *Jones v. United States*, 27 A.3d 1130, 1134-35 (D.C. 2011), the defendant confessed to a cellmate that he and a companion shot and killed a man in the District of Columbia over a

21

Fourth of July weekend and then traveled to North Carolina where they robbed a check-cashing store, shooting a security guard in the process. In the prosecution for the D.C. murder, not only was the cellmate's testimony to the confession admitted into evidence, but also admitted was evidence of the North Carolina robbery and shooting. In holding that admitting the bad act evidence had been proper, the appellate court explained, "The fact that the North Carolina evidence corroborated the details of Jones's confession to his participation in the robbery suggests that Jones spoke with candor about his role in the murder as well." *Id.* at 1146.

Had Perry's murders of his three victims been tried separately, Ms. Everson's testimony that Perry confessed to shooting multiple prostitutes and leaving them by a river would have been powerful evidence in each case if the jury found Ms. Everson to be credible and was satisfied that Perry's claim to have murdered multiple prostitutes was not just "jail talk." As was raised by the panel during oral argument of Perry's appeal, evidence tying Perry to two other murders of prostitutes would have been relevant and important to the State by supporting the reliability of Ms. Everson's testimony and the candor of Perry's confession. The evidence would have been admissible for this purpose even before considering "commonalities" that the trial court identified as supporting cross admissibility under ER 404(b). RP at 135.

Given the cross admissibility of evidence of the murders to support Ms. Everson's report of Perry's confession, there was no significant disparity in the strength of the

22

State's evidence for the individual counts. Perry could be tied definitively by DNA only to Ms. Brisbois's murder and less strongly to Ms. Sapp's murder. Even without that evidence, however, the following evidence could be offered in each case: Perry's confession to Ms. Everson, his incriminating statements to detectives and others, proof that he lived in Spokane when the murders occurred and had guns of the type used in the murders, and commonalities suggesting that the three murders had been committed by the same person. Given that evidence, even the charge of murdering Ms. Lowe, supported by Perry's fingerprint on the tube of lubricant found near her wallet, was a solid case. We find no abuse of discretion by the trial court in denying the motion to sever.

III.    THE JURY'S FINDING OF THE COMMON SCHEME OR PLAN AGGRAVATOR IS SUPPORTED BY THE EVIDENCE

A defendant is guilty of aggravated first degree murder if, in committing a first degree murder, a statutory aggravating circumstance exists. RCW 10.95.020. A person convicted of the crime of aggravated first degree murder must be sentenced to life imprisonment without the possibility of release or parole. RCW 10.95.030(1).

The State charged Perry with the aggravating circumstance that "[t]here was more than one victim and the murders were part of a common scheme or plan." RCW 10.95.020(10). The jury returned special verdicts finding the aggravator had been proved. The common scheme or plan aggravator requires "a 'nexus between the killings.'" *State v. Pirtle*, 127 Wn.2d 628, 661, 904 P.2d 245 (1995) (quoting *State v.*

*Dictado*, 102 Wn.2d 277, 285, 687 P.2d 172 (1984)). Perry argues there was insufficient evidence to establish the common scheme and plan aggravator because "there was no evidence or even theory of a uniting purpose between the murders, only an assertion that Perry committed all three of them in a somewhat similar, yet somewhat different, fashion." Appellant's Br. at 45.

"'The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.'" *State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). A defendant's claim of insufficient evidence admits the truth of the State's evidence and "'all inferences that reasonably can be drawn [from it].'" *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015) (alteration in original) (quoting *Salinas*, 119 Wn.2d at 201)).

Ms. Everson testified that Perry told her that in killing multiple prostitutes, he would pick a target, study their moves, and then would execute them. She said that according to Perry, the execution would take place in a vehicle by a river, after which Perry would kick the victim's body out of the vehicle and leave them behind; that burying them "was somebody else's problem." RP at 1526. Ms. Everson testified that Perry described the prostitutes to Ms. Everson as "nothing. They were nobodies. They were pond scum." RP at 1522. In closing argument, the State offered, as a theory of a

uniting purpose for the murders, Perry's "downright hatred" of the type of woman he targeted. RP at 1835. The prosecutor reminded jurors not only of what Perry told Ms. Everson, but also that each of the victims was shot at least once in the torso and each of the victims' bodies "was left displayed on the banks of the Spokane River in northeast Spokane. They were either naked or their breasts and genitals were otherwise purposely exposed" and "[t]here was no indication of sexual assault." RP at 1835-36.

Viewing the evidence and inferences in the light most favorable to the State, rational jurors could find the aggravator proved beyond a reasonable doubt.

IV.    NO PUBLIC TRIAL VIOLATION IS SHOWN

Presumably because of the notoriety of the crimes charged, 385 prospective jurors were summoned to appear for jury selection in Perry's case. In the course of addressing other pretrial matters with counsel, the trial court explained that it was going to do the initial introduction of the case to prospective jurors in the Spokane County Courthouse's jury lounge, sometimes referred to as the juror assembly room. Stating that "they're only going to be in that room a short time," the court explained that what it planned to do in the lounge was to go through the initial jury instruction and explain a jury questionnaire that prospective jurors would be required to complete. RP at 221. It added that jurors would fill out the questionnaires and turn them into court staff in the juror lounge, with jury selection thereafter taking place in the courtroom.

The 11-page transcript of proceedings in the jury lounge records the court's administration of the oath to the venire, its introduction of court staff and the lawyers, a reading of the short summary of the case, and an explanation that a questionnaire was going to be passed out for the jurors' completion because "[t]he media has published a number of news stories regarding this case." RP (June 6, 2017) at 9.

For the first time on appeal, Perry argues that this initial gathering of prospective jurors in the jury lounge without conducting a *Bone-Club*[12] analysis violated her public trial right under the Sixth Amendment to the United States Constitution and article I, section 22, of the Washington State Constitution. Without citation to the record, Perry asserts that conducting this initial part of the jury orientation/selection process in the jury lounge "closed the courtroom because the jury room is not generally accessible to spectators." Appellant's Br. at 49. She makes no showing that anyone was excluded from the juror lounge, or even that entry into the lounge was closed or obstructed.

In *State v. Parks*, 190 Wn. App. 859, 862, 363 P.3d 599 (2015), *review denied*, 185 Wn.2d 1032 (2016), this court addressed an argument that a Spokane County trial court violated Mr. Parks's right to a public trial by swearing in the venire and passing out questionnaires in the jury assembly room without conducting a *Bone-Club* analysis. The decision noted that the reason given by the trial court was that "[t]here is a large jury

---

[12] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

panel," and, "We probably can't get them all in the courtroom at any one time." *Id.* at n.2.

In *Parks*, as here, "[n]othing show[ed] spectators were totally excluded" and "[n]othing

show[ed] whether the door to the jury assembly room was open or closed." *Id.* at 865.

The court found that Parks's public trial contention failed because "(1) he has not

demonstrated a closure occurred, (2) such action at issue is not within the category of

proceedings the Washington Supreme Court has already acknowledged implicates the

public trial right, and (3) the court's action does not satisfy the experience and logic test."

*Id.* at 865.

Perry fails to distinguish *Parks*, which is controlling. No public trial violation is

shown.[13]

---

[13] Were *Parks* not controlling, we would readily find any public trial violation to be de minimis under *State v. Schierman*, 192 Wn.2d 577, 438 P.3d 1063 (2018), which held that even where the public trial right is implicated, a closure may be a de minimis violation if it does not actually undermine the purposes of the public trial right. Those well-established purposes are:

> "to ensure a fair trial, to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, to encourage witnesses to come forward, and to discourage perjury. It also affirms the legitimacy of the proceedings and promotes confidence in the judiciary."

*Id.* at 769 (internal quotation marks omitted) (quoting *In re Det. of Morgan*, 180 Wn.2d 312, 325, 330 P.3d 774 (2014)).

V.    THE TRIAL COURT'S STATEMENT TO A JUROR THAT PERRY'S WAS NOT A DEATH
      PENALTY CASE WAS HARMLESS

At the outset of voir dire, the trial court posed general questions to jurors, one

being whether there was anything that would cause any juror to begin the trial with

feelings or concerns.  Juror 84 raised his hand and told the court, "I have an objection to

the death penalty, so if this is a death penalty case, I will not be able to."  RP at 273.  The

court responded, "Thanks for letting me know that, sir.  Not a death penalty case."  *Id.*

Outside the presence of the jury, defense counsel informed the court that telling

jurors that Perry's was not a death penalty case was error.  The defense thereafter moved

for a mistrial and the prosecutor conceded that such a disclosure had been held to be error

in *State v. Townsend*, 142 Wn.2d 838, 15 P.3d 145 (2001).  The State's counsel also

pointed out, however, that an erroneous disclosure that the death penalty was not at issue

had been held to be harmless, especially if jurors were given a curative instruction not to

consider sentencing.[14]  The trial court denied the motion for a mistrial but gave the

following curative instruction, both when voir dire resumed and at the close of the

evidence:

---

[14] In *Townsend* and *State v. Hicks*, 163 Wn.2d 477, 487, 181 P.3d 831 (2008),
claims that defense counsel was ineffective either for failing to object when the jury was
informed the case was not a capital case or for raising the noncapital nature of the case
itself failed because prejudice was not shown.  *Townsend*, 142 Wn.2d at 849.  In *State v.
Mason*, 160 Wn.2d 910, 931, 162 P.3d 396 (2007), the trial court was found to have erred
by telling jurors that the case did not involve a request for the death penalty, but the error
was held to be harmless.

> Ladies and gentlemen, please be advised that during this trial, you will have nothing whatever to do with any punishment that may be imposed in case of a violation of the law. You may consider the fact that punishment may follow conviction, only insofar as it tends to make you careful.

RP at 305, 1760.

Perry argues that denying his motion for a mistrial was error.

Following the briefing and argument of this case, the Washington Supreme Court overruled *Townsend* in *State v. Pierce*, ___ Wn.2d ___, ___ P.3d ___, 2020 WL 103341 (2020) (plurality opinion). All of the justices agreed that *Townsend* should be overruled. But only the lead opinion, signed by three justices, clearly overruled *Townsend* not only because its legal underpinnings had changed or disappeared with the court's 2018 decision that the death penalty was unlawful, *see State v. Gregory*, 192 Wn.2d 1, 19, 427 P.3d 621 (2018), but for the further reason that *Townsend* "was incorrect and harmful even without *Gregory*." *Pierce*, 2020 WL 103341, at *5 (lead opinion). A four-member dissent held that following *Gregory*, *Townsend* is no longer germane, but *Townsend* was correct when decided and controlled the 2015 proceedings in Pierce's case. *Pierce*, 2020 WL 103341, at *9 (Madsen, J., dissenting). A two-member concurrence agreed that *Townsend* should be overruled without stating whether it was incorrect and harmful. *Id.* at *7 (Stephens, C.J., concurring).[15]

---

[15] The lead opinion and concurrence in *Pierce* agreed that the case should be remanded; the lead opinion was concerned with a possible GR 37 violation and the

Based on the lineup of the nine justices' reasoning in *Pierce*, we treat *Townsend* as correctly decided and controlling at the time of Perry's 2017 trial. But especially in light of *Pierce*, we are satisfied that the trial court's curative instruction was an adequate remedy and rendered the error harmless.

VI.   CHALLENGES TO COSTS

Invoking RAP 14.2, Perry's opening brief asks this panel to deny appellate costs to the State if she does not substantially prevail on appeal. A general order of this division states that panels will no longer entertain a criminal defendant's argument to waive appellate costs awardable to the State; any such argument will be decided by the clerk or the commissioner in accordance with RAP Title 14. Gen. Ord. of Division III, *In re the Matter of Court Admin. Ord. re: Appellate Costs* (Wash. Ct. App. Feb. 19, 2019), http://www.courts.wa.gov/appellate_trial_courts/div3/Order-Rescind%20Deny %20Request%20to%20Award%20Costs%20General%20Order%202-19-19.pdf.

In a motion filed after her opening brief, Perry asks us to strike the $110 criminal filing fee from her judgment and sentence in light of *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018), which held that statutory LFO reform that became effective in June 2018 applies to cases then on direct review. The State concedes that Perry is entitled to

---

concurrence was concerned that a lengthy discussion of the death penalty during voir dire resulted in incurable prejudice.

No. 35476-8-III
*State v. Perry*

relief under *Ramirez*. We grant Perry's request for the ministerial correction to the judgment.

The convictions are affirmed and the case is remanded with directions to strike the criminal filing fee from the judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Pennell, J.

31