**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84534-9-I (consolidated with No. 87502-7-I) |
| Respondent, | |
| v. | DIVISION ONE |
| CALEB DANE BELL, | PUBLISHED OPINION |
| Appellant. | |

MANN, J. — Caleb Bell was convicted after a bench trial of unlawful possession of a firearm in the second degree while subject to a domestic violence protection order issued under former chapter 26.50 RCW. Bell appeals and argues that former RCW 9.41.040(2)(a)(iii),[1] as applied, violates his right to keep and bear arms under the Second Amendment to the U.S. Constitution. We disagree and affirm.

I.     BACKGROUND

A.  Protection Order

In October 2021, a temporary protection order issued under former chapter 26.50 RCW was served on Bell prohibiting him from contacting his mother Callie Clark and

---

[1] This provision has since been recodified several times without substantive change. We refer to the statute that was in effect at the time of the offense.

minor child A.R.H.  The temporary order required Bell to "surrender all firearms and prohibit[ed] him from accessing, obtaining, or possessing firearms."  Bell was personally served with a copy of the petition, the temporary protection order, notice of a hearing on November 4, 2021, and an order to surrender weapons.  Bell did not appear at the November 4 hearing, nor did he appear at a rescheduled hearing two weeks later.  A superior court commissioner entered a final protection order on November 18, 2021.

The protection order identified that Bell and Clark were family or household members because they were a parent and child.  The protection order restrained Bell from "causing physical harm, bodily injury, assault, including sexual assault, and from molesting, harassing, threatening, or stalking" Clark and A.R.H.  The order also restrained Bell from coming near or having contact with Clark and A.R.H. and excluded him from their residence.  The order required Bell to surrender weapons and prohibited him from accessing, possessing, or obtaining any firearms.  The order requiring Bell to surrender weapons was based on the court commissioner's findings that Bell "had actual notice, represented a credible threat, and was an intimate partner."  The order also found that Bell "presents a serious and imminent threat to public health or safety, or the health and safety of any individual by possessing a firearm or other dangerous weapon."

B.  Arrest and Trial

On January 1, 2022, Bell appeared at a QFC kiosk with an AK-47 assault rifle. Bell asked the clerk for cigarettes.  When the clerk asked for payment, Bell pointed the rifle at him.  Bell admitted at trial that he knowingly possessed the rifle, which he was

still carrying when arrested about an hour later. The AK-47 was later test-fired and determined operable.

The State charged Bell with attempted robbery in the first degree and unlawful possession of a firearm in the second degree (UPF-2) under former RCW 9.41.040(2)(a)(iii)(C)(I) and (C)(II). The trial was bifurcated. A jury convicted Bell of attempted robbery and found that he had been armed with a firearm. Following a bench trial, Bell was convicted of UPF-2. The trial court found that the protection order met the legal requirements in former RCW 9.41.040. At the time of trial, RCW 9.41.040 defined UPF-2 as follows:

> (2)(a) A person, whether an adult or juvenile, is guilty of the crime of unlawful possession of a firearm in the second degree, if the person does not qualify under subsection (1) of this section for the crime of unlawful possession of a firearm in the first degree and the person owns, has in his or her possession, or has in his or her control any firearm:
>
> . . . .
>
> (iii) During any period of time that the person is subject to a court order issued under . . . former chapter[ ] . . . 26.50 RCW that:
>
> (A) Was issued after a hearing for which the person received actual notice, and at which the person had an opportunity to participate, whether the court then issues a full order or reissues a temporary order. If the court enters an agreed order by the parties without a hearing, such an order meets the requirements of this subsection;
>
> (B) Restrains the person from harassing, stalking, or threatening the person protected under the order or child of the person or protected person, or engaging in other conduct that would place the protected person in reasonable fear of bodily injury to the protected person or child; and
>
> (C)(I) Includes a finding that the person represents a credible threat to the physical safety of the protected person or child and by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against the protected person or child that would reasonably be expected to cause bodily injury; or

(II) Includes an order under RCW 9.41.800 requiring the person to surrender all firearms and prohibiting the person from accessing, having in his or her custody or control, possessing, purchasing, receiving, or attempting to purchase or receive, firearms.

The trial court found that Bell was given actual notice of the hearing to address the temporary protection order. The trial court also found that Bell had actual notice but did not appear for the second hearing where the full protection order was issued. The trial court found that because the court commissioner did not check the box on page 1 of the protection order stating that Bell represented "a credible threat to the physical safety of the protected person[s]," the State failed to prove UPF-2 under former RCW 9.41.040(2)(a)(iii)(C)(I).[2] But the trial court concluded that the protection order still satisfied the requirements for the conviction because the order required Bell to surrender all firearms under RCW 9.41.040(2)(a)(iii)(C)(II). Accordingly, the trial court concluded that Bell was guilty of UPF-2.

## C. Appeal

Bell timely appealed to this court raising a facial challenge to the constitutionality of RCW 9.41.040(2)(a)(iii). We granted a joint motion to certify the appeal to our Supreme Court. The court accepted review, and on July 18, 2023, stayed its consideration pending the U.S. Supreme Court's decision in United States v. Rahimi, 602 U.S. 680, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024). On June 21, 2024, the U.S. Supreme Court issued Rahimi, upholding the constitutionality of 18 U.S.C. § 922(g)(8)—a statute similar to RCW 9A.41.040(2)(a)(iii). After inviting supplemental briefing on

---

[2] The trial court's findings and conclusion reference the State's jury instructions which are not part of the appellate record. The language used by the court, however, is consistent with the language in former RCW 9.41.040(2)(a)(iii)(C)(I) and (C)(II).

November 6, 2024, our Supreme Court terminated review and transferred the appeal back to this court. Because Bell's supplemental brief raised a new "as-applied" challenge to RCW 9.41.040(2)(a)(iii), we invited a response from the State and reply from Bell.

## II.      DISCUSSION

### A.  The Second Amendment

The Second Amendment to the U.S. Constitution states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.[3] This provision has been incorporated to the states through the due process clause of the Fourteenth Amendment. McDonald v. City of Chicago, Ill, 561 U.S. 742, 791, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010).

The U.S. Supreme Court has construed the Second Amendment as "guarantee[ing] [an] individual right to possess and carry weapons in case of confrontation." Dist. of Columbia v. Heller, 554 U.S. 570, 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). This right extends to the right to possess a handgun in the home for self-defense as well as "an individual's right to carry a handgun for self-defense outside the home." New York Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 9-10, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022). In Heller, the Court invalidated the District of Columbia's prohibition on possession of handguns in the home and held that the

---

[3] The Washington Constitution provides independent protection of the right to bear arms. WASH. CONST. art. I, § 23; State v. Rupe, 101 Wn.2d 664, 706, 683 P.2d 571 (1984). Bell's opening brief does not cite the Washington Constitution and his sole assignment of error relies on the Second Amendment. It is therefore unnecessary to discuss article I, section 23. See O'Day v. King County, 109 Wn.2d 796, 810, 749 P.2d 142 (1988).

Second Amendment guarantees a right to keep and bear arms.  But the Court clarified that the right is not unlimited.  Heller, 554 U.S. at 626-27.  Specifically, the Court cautioned:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Heller, 554 U.S. at 626-27.

In Bruen, the Supreme Court clarified the framework for analyzing Second Amendment challenges:

> [W]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct . . . [and] the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 17 (quoting Konisberg v. State Bar of Cal., 366 U.S. 36, 50 n.10, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961).  Accordingly, a court must first determine whether the Second Amendment's plain text covers the individual's conduct.  Bruen, 597 U.S. at 17.  If so, the constitution presumptively protects the conduct, and the State must show that the regulation is consistent with the nation's historical tradition of firearm regulation. Bruen, 597 U.S. at 17.  The "why" and "how" of firearm regulations are central to the inquiry.  Bruen, 597 U.S. at 29.

The Supreme Court most recently applied the Bruen framework in Rahimi. There, the defendant was indicted under 18 U.S.C. § 922(g)(8), a federal statute that prohibits individuals who are subject to a domestic violence restraining order from

possessing a firearm.  Rahimi, 602 U.S. at 688.  The defendant made a facial challenge to the statute arguing that it violated his Second Amendment rights.  Rahimi, 602 U.S. at 693.  Like former RCW 9.41.040(2)(a)(iii), Section 922(g)(8) provided two bases for liability: (1) limiting an individual from possessing a firearm if the protection order includes a finding that he poses a "credible threat to the physical safety" of a protected person and (2) if the protection order "prohibits the use, attempted use, or threatened use of physical force."  Rahimi, 602 U.S. at 693 (quoting 18 U.S.C. § 922(g)(8)(C)(i) and 18 U.S.C. § 922(g)(8)(C)(ii)).

In its analysis, the Court traced the history of firearm regulation, explaining that since the founding, the nation's firearm laws have included regulations to stop individuals who threaten physical harm to others from misusing firearms.  Rahimi, 602 U.S. at 694.  As the Court explained, by the early 1800s, two distinct legal regimes had developed that specifically addressed firearms violence: surety laws and "going armed" laws.  Rahimi, 602 U.S. at 694-95, 697.  Surety laws were a form of preventive justice that authorized magistrates to require individuals suspected of future mischief to post a bond, and if that person failed to post bond, they would be jailed.  Rahimi, 602 U.S. at 695.  And if that person posted the bond and then broke the peace, the bond would be forfeited.  Rahimi, 602 U.S. at 695.  Surety laws could be invoked to prevent all forms of violence, including spousal abuse and the misuse of firearms.  Rahimi, 602 U.S. at 695-96.

The Court also detailed "going armed" laws, which prohibited fighting in public.  Rahimi, 602 U.S. at 697.  Under these laws, individuals were prohibited from "'riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the

land.'"  Rahimi, 602 U.S. at 697 (alterations in original) (quoting 4 WILLIAM BLACKSTONE,

COMMENTARIES, *149).

The Court explained that these laws offered the accused significant procedural

protections.  Rahimi, 602 U.S. at 696.  For example, before the accused could be

required to post bond, a complaint had to be made to a judge by any person having

reasonable cause to fear the accused would do them harm or breach the peace.

Rahimi, 602 U.S. at 696 (citing MASS. REV. STAT. ch. 134, § 16).  The magistrate would

then analyze the evidence, and if the magistrate determined there was sufficient

evidence, they would summon the accused who could respond to the allegations.

Rahimi, 602 U.S. at 696-97 (citing MASS. REV. STAT. ch. 134, §§ 3-4).  Lastly, bonds

could not be required for more than six months at a time, and the individual could obtain

an exception if they needed firearms for self-defense or another legitimate reason.

Rahimi, 602 U.S. at 697 (citing MASS. REV. STAT. ch. 134, §16).

With that history in mind, the Court held that Section 922(g)(8) survives

constitutional challenge:

> Taken together, the surety and going armed laws confirm what
> common sense suggests: When an individual poses a clear threat
> of physical violence to another, the threatening individual may be
> disarmed.  Section 922(g)(8) is by no means identical to these
> founding era regimes, but it does not need to be.  Its prohibition on
> the possession of firearms by those found by a court to present a
> threat to others fits neatly within the tradition the surety and going
> armed laws represent.
>
> Like the surety and going armed laws, Section 922(g)(8)(C)(i)
> applies to individuals found to threaten the physical safety of
> another.  This provision is "relevantly similar" to those founding era
> regimes in both why and how it burdens the Second Amendment
> right.  [Bruen, 597 U.S. at 29].  Section 922(g)(8) restricts gun use
> to mitigate demonstrated threats of physical violence, just as the

> surety and going armed laws do. Unlike the regulation struck down in Bruen, Section 922(g)(8) does not broadly restrict arms use by the public generally.

Rahimi, 602 U.S. at 698 (citing Bruen, 597 U.S. at 30).

The Court also found the procedural protections sufficiently analogous to surety and going armed laws because Section 922(g)(8)'s restriction was temporary in nature and required "judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." Rahimi, 602 U.S. at 699.

Accordingly, the Court determined that Section 992(g)(8) survived Rahimi's facial challenge because this nation's tradition of firearm regulations allows the government to disarm individuals who present a credible threat to the physical safety of another. Rahimi, 602 U.S. at 700.

### B. As Applied to Bell

Bell argues Rahimi does not control his as-applied constitutional challenge[4] because the protection order did not contain a finding that he presented a credible threat to another.[5] We disagree.

---

[4] In Bell's supplemental briefing post-Rahimi, he abandons his facial challenge to the statute. But regardless, Rahimi disposes of the facial challenge to the statute because the statutes are substantially similar, and Bell does not present argument to the contrary. See former RCW 9.41.040(2)(a)(iv)(C)(I) (2022) ("[i]ncludes a finding that the person represents a credible threat to the physical safety of the protected person"); 18 U.S.C. § 922(g)(8)(C)(i) ("includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child"). Additionally, similar to Rahimi, 602 U.S. at 699, Washington law allows individuals subject to a protection order to terminate the order "once in every 12-month period that the order is in effect." RCW 7.105.500(7). The statute also allows the respondent to move the court to modify or terminate the protection order if the respondent proves that there has been a substantial change in circumstances. RCW 7.105.500(3).

[5] The parties do not dispute that the first part of the Bruen test is met. The Second Amendment's plain text covers Bell's conduct, so the constitution presumptively protects his conduct. Bruen, 597 U.S. at 17. Accordingly, the issue turns on whether as applied, RCW 9.41.040(2) is consistent with this Nation's historical tradition of firearm regulation.

An "as-applied" challenge to a statute's constitutionality requires examination of the statute in the specific circumstances of the case. See Fields v. Dep't of Early Learning, 193 Wn.2d 36, 46, 434 P.3d 999 (2019). When a court holds a statute unconstitutional as applied, it does not totally invalidate the statute, but it instead prohibits the application in that specific context and future similar contexts. City of Redmond v. Moore, 151 Wn.2d 664, 669, 91 P.3d 875 (2004).

### 1. Threat of Physical Violence

Bell argues that because his UPF-2 conviction was based on an order prohibiting him from possessing firearms—not because he presented a credible threat to another— Rahimi does not control. We disagree. While Rahimi only addressed whether a finding of a credible threat was sufficient to bar an individual from possessing firearms, its reasoning still applies. 602 U.S. at 693.[6] The relevant question is whether the underlying protection order requiring Bell to surrender his firearm is violative of the Second Amendment.

Bell was convicted under former RCW 9.41.040(2)(a)(iii)(C)(II), which required that the trial court find that at the time of arrest, Bell was under a court order that included "an order under RCW 9.41.800 requiring the person to surrender all firearms

---

[6] The Court explained:

Recall that Section 922(g)(8) provides two independent bases for liability. Section 922(g)(8)(C)(i) bars an individual from possessing a firearm if his restraining order includes a finding that he poses "a credible threat to the physical safety" of a protected person. Separately, Section 922(g)(8)(C)(ii) bars an individual from possessing a firearm if his restraining order "prohibits the use, attempted use, or threatened use of physical force." Our analysis starts and stops with Section 922(g)(8)(C)(i) because the Government offers ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others. We need not decide whether regulation under Section 922(g)(8)(C)(ii) is also permissible.

and prohibiting the person from accessing, having in his or her custody or control, possessing, purchasing, receiving, or attempting to purchase or receive, firearms." It is undisputed that Bell was under such a court order.

RCW 9.41.800(4) grants discretion for trial courts to order an individual to surrender and not possess firearms under a protective order where it finds the person presents a serious threat to public health and safety:

> (4) In addition to the provisions of subsections (1) and (3) of this section, the court may enter an order requiring a party to comply with the provisions in subsection (1) of this section if it finds that the possession of a firearm or other dangerous weapon by any party presents a serious and imminent threat to public health or safety, or to the health or safety of any individual.

The underlying protection order includes such a finding.

While the record supporting the original protection order is not before us in this appeal, the State's sentencing memorandum summarized the original petition:

> On October 20, 2021, Ms. Callie Clark, the defendant's mother, filed a petition for a protection [order] with the Snohomish County Superior Court. In that petition, Ms. Clark expressed serious concerns regarding Mr. Bell's behavior over the last 8 months. In particular, she said that he has been threatening the lives of his family as well as others and that they believe the threats he is making. Mr. Bell has spoken about killing people directly to Ms. Clark and consistently refuses medical treatment or help with his drug problem. He has also communicated specific plans to kill or rob various individuals to Ms. Clark as well as his daughter. On one occasion, he attempted to assault Ms. Clark and then claimed he could not control himself. It is also noted that he consistently is agitated and angry and shows no remorse for things he says or does.[7]

This more than supports the commissioner's finding that Bell constituted a serious and imminent threat.

---

[7] The State has moved to supplement the record with the original petition for a protection order. While we agree with the State that if a Second Amendment challenge had been made before the trial court the State would likely have offered other evidence, we decline to open the record at this point and deny the State's motion.

Bell argues that the historical analysis in <u>Rahimi</u> is inapplicable here because "[s]urety and going armed laws hinge upon a concern the restrained individual poses a specific threat to another." To the extent Bell argues that a specific victim is required, we disagree. Again, as <u>Rahimi</u> held:

> Whether classified as an affray law or a distinct prohibition, the going armed laws prohibited "riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land." Such conduct disrupted the "public order" and "le[d] almost necessarily to actual violence." Therefore, the law punished these acts with "forfeiture of the arms . . . and imprisonment."

602 U.S. at 697(alterations in original) (citations omitted) (quoting 4 BLACKSTONE, <u>supra</u>, at *149; <u>State v. Huntly</u>, 25 N.C. 418, 421-22 (1843)). And further:

> Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed. Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be. Its prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent.

<u>Rahimi</u>, 602 U.S. at 698.

Thus, while <u>Rahimi</u> itself focused on a credible threat to an individual, its historical analysis is equally applicable to a situation, as here, where Bell presented "a serious and imminent threat to public health or safety, or the health or safety of any individual by possessing a firearm or other dangerous weapon." The protection order is consistent with this nation's tradition of firearm regulation and compatible with the Second Amendment. <u>Rahimi</u>, 609 U.S. at 700.

### 2. Procedural Protections

Bell argues alternatively that his conviction should be vacated because the serious and imminent finding was entered despite never hearing from Bell, so surety laws are not a proper historical analogue to the challenged application, which places his case outside the scope of Rahimi. We disagree.

In Rahimi, the court emphasized that surety laws and going armed laws had strong procedural protections, including an opportunity to hear from the accused and durational limits on the orders. 602 U.S. at 696. Bell argues that receiving notice and an opportunity to attend the hearing was not enough because there was no back up plan if he was not present in court and surety laws required actually hearing from the accused. Bell concedes that modern law need not employ the same procedural protection as surety laws for them to qualify as a historical analogue.

Procedural due process generally requires "notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" In re Det. of Morgan, 180 Wn.2d 312, 320, 330 P.3d 774 (2014) (emphasis added) (internal quotation marks omitted) (quoting Amunrud v. Bd. of Appeals, 158 Wn.2d 208, 216, 143 P.3d 571 (2006)). Whether additional process is required in a given context implicates the balancing test from Mathews v. Eldridge.[8] In re Det. of Stout, 159 Wn.2d 357, 370, 150 P.3d 86 (2007). Bell's supplemental brief cites Mathews only in passing without any substantive discussion. Bell also ignores that "[s]afeguards for both those seeking protective orders

---

[8] 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

-13-

and those subject to them are built into chapter 26.50 RCW." Aiken v. Aiken, 187 Wn.2d 491, 497, 387 P.3d 680 (2017).

There were strong procedural protections here. The trial court determined that Bell received actual notice for the hearing and had the opportunity to be heard. Similarly, the protection order was of limited duration, and there were mechanisms in the law for Bell to modify or terminate the order. Bell suggests that there needs to be procedural protections beyond notice and opportunity in the Second Amendment context. But Bell fails to cite authority to support this point. The court did not hear from Bell only because Bell chose not to appear at either of the two hearings on the protection order. The procedural protections were there, but Bell failed to use them.

### 3. Protection of Home

Bell lastly argues that RCW 9.41.040(2)(a)(iii) is unconstitutional because it prohibits any and all possession of a firearm, including if done in self-defense of his home. We disagree. Rahimi rejected a similar argument explaining "Heller never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" Rahimi, 602 U.S. at 699 (quoting Heller, 554 U.S. at 626). Therefore, this argument was considered and rejected by Rahimi. Bell was disarmed because he represented a serious and imminent threat to the public. There is no authority that dangerous individuals can retain partial firearm rights even though they are lawfully disarmed.

We affirm.[9]

_Mann, J._

WE CONCUR:

_Díaz, J._               _Birk, J._

---

[9] In a statement of additional grounds, Bell argues that: (1) his jury was not impartial because members of the jury knew the prosecutor and the judge; (2) his speedy trial rights were violated; (3) defense counsel was ineffective for not contacting him about a plea deal and informing him about discovery; (4) the judge did not allow for impeachment of the main witness; and (5) he was prohibited from discussing where he spent the money after he left the kiosk. Because these assertions are either vague, conclusory, or out of the record, we conclude that none of these warrant reversal.